# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

Katherine Lanteri, individually and on )
behalf of all others similarly situated )
  )
      Plaintiff, )
  )
     vs. )      Case No. 1:13-cv-01501-WTL-DKL
  )
Credit Protection Association, L.P., a )
Texas limited partnership, and ETAN )
General, Inc., a Texas corporation, )
  )
      Defendants. )

---

## RESPONSE IN OPPOSITION TO PLAINTIFF'S
## CORRECTED SECOND AMENDED MOTION FOR CLASS CERTIFICATION

Defendants[1], Credit Protection Association, L.P. ("CPA") and ETAN General, Inc. ("Etan") (collectively "Defendants"), by and through their attorney, Justin M. Penn, and for their Response in Opposition to Plaintiff's Corrected Second Amended Motion for Class Certification state:

### INTRODUCTION

Plaintiff seeks to represent and certify individuals who allegedly told CPA to stop contacting them as well as individuals who were subject to the bankruptcy based stay orders. (Docket Entry ("Dkt") Dkt. # 150, pp. 1-2). Prior to moving for certification, plaintiff neglected to take a single deposition and her expert failed to speak to any employees of CPA (or anyone else) regarding the records he was interpreting. The Court denied of Plaintiff's Amended Motion for Class Certification on the basis that plaintiff sought to certify a fail-safe class (Dkt. 137 at p. 2). Just like plaintiff's earlier certification motion, plaintiff's current motion fatally relies on the opinion of Robert

---

[1] As this Court noted in its prior opinion denying the first motion for class certification, ETAN General, Inc. denies that it did anything. That issue, if necessary, will be addressed at summary judgment. For ease of reference, they may be referred to collectively or as CPA without meaningful distinction for purposes of the class motion.

Biggerstaff. Mr. Biggerstaff has been retained in hundreds of TCPA related lawsuits, but has primarily testified in cases involving facsimile based TCPA claims.

Plaintiff seeks to certify two classes under the TCPA: (a) persons who received text messages after texting some variation of the message "stop" to CPA's text vendor, who did not recognize the request, and (b) persons who received text messages from CPA after an automatic bankruptcy stay was entered. (Dkt. # 150 at pp. 4-5). Plaintiff's motion concludes without explanation that "Defendants' conduct violates the TCPA in a uniform manner" and that class members are ascertainable. (*Id.* at pp. 2, 6). As explained in this brief, both contentions are wrong.

Plaintiff's motion should be denied for multiple reasons. First, the proposed class fails to meet the requirements of typicality and commonality because plaintiff's claims are not typical or common to the two classes.

Second, the proposed class is not a superior method of resolving this case because the putative class members will be subjected to numerous individualized inquiries. For example, a class cannot be certified simply because a person asked CPA to "stop" texting. The reason such a class fails is because the use of the word "stop" does not always reflect a debtor's desire to cease all communications via text messages or telephone calls. Simply stated, the phrase "stop" is overly inclusive and does not result in, as plaintiff claims, an "undisputed" stop request. Further, debtors may falsely type "stop I'm not debtor" in an effort to avoid collection efforts. Defendants disagree with plaintiff's contention that Biggerstaff's report "narrowed the search criteria to remove any account where there is any doubt about whether a stop request was made." (Dkt. 150, p. 5 fn 3). Rather, to resolve whether a person is a member of the proposed class, discovery will still need to be taken, as plaintiff acknowledges, to verify whether the person was the debtor in question.

Third, Defendants also dispute that the bankruptcy based class can be ascertained simply by what plaintiff calls an "administrative process." (Dkt. 150, p. 6). Contrary to plaintiff's arguments

that CPA has engaged in "deficient record keeping," the proposed classes are fraught with individual inquires that are a result of plaintiff's improperly pled classes.

Finally, plaintiff and her counsel are inadequate. Plaintiff is susceptible to a defense unique to her in that she lacks standing. Moreover, plaintiff and her counsel have from the outset of this case engaged in a retainer agreement that renders them inappropriate as representatives.

## RELEVANT FACTS AND PROCEDURAL HISTORY

At the outset of this case, the parties discussed with this Court that CPA's primary concern, and the impediment to settlement, was whether the plaintiff had effectively revoked consent, or could represent a class of similarly situated persons. The parties also discussed that this case presented unique and novel legal theories as to whether and how a party could revoke consent under the TCPA, either in receiving texts or through the filing of bankruptcy, *after providing a number to an original creditor*. Despite discussing these issues at the outset, the parties have spent considerable resources in examining plaintiff's multiple expert reports, corrected reports and supplemental reports. Each time plaintiff purports to correct issues Defendants have highlighted, and each time plaintiff and her expert fail. As discussed below, plaintiff is attempting to certify a legally and factually unwieldy class, completely ignoring the underlying factual circumstances surrounding the plaintiff and the difficulties with certifying a class of persons with disparate circumstances.

Plaintiff also goes to great lengths to misstate the underlying procedural history, all of which was closely monitored by this Court, and which is a distraction to the issues presented in her latest class certification motion. Needless to say, the record shows, and this Court is no doubt aware, that plaintiff's recitation of the underlying discovery process is disingenuous[2].

---

[2] Plaintiff repeatedly makes wholly inaccurate accusations of wrongdoing, factual misstatements without any reference to the record, and attempts to manipulate what little record upon which they rely. As just one example, plaintiff at one point in her brief explains that Defendants grossly misstated the class size as including 5,400 accounts. (Dkt. 150, pp. 4-5). When it suits them later in the brief, however, they assert that Defendants "admitted" the class is 5,400. Id., p. 12. Neither is true. The reference to 5,400 is a reference to a response to plaintiff's motion to compel in which Defendants correctly explained that the vast majority of the information they sought, the information related to 440,000 persons,

3

Plaintiff claims to have requested CPA stop texting her and then later received a text. CPA hired RingClear, an outside vendor, to manage the sending of its texts. See Declaration of Diane Evans, attached hereto as Exhibit A, ¶3. One of the contractual requirements to which RingClear agreed was that it would suppress the sending of texts to anyone who responded with the word "Stop." Ex. A, ¶4. After the filing of this lawsuit, CPA learned for the first time that RingClear, with respect to the plaintiff, received a response that said "stop", and apparently did not suppress the number in a future text request from CPA. Ex. A, ¶5. During the discovery process in this case, it came to CPA's attention that RingClear had previously sent emails that contained reports that included some responses to text messages, but no one at CPA understood RingClear was failing to suppress texts to consumers who responded "Stop". Ex. A, ¶6. Those emails and corresponding reports were not reviewed in any detail by nor incorporated into CPA's account notes for consumers. Ex. A, ¶7.

Plaintiff also claims that CPA contacted her after she filed for bankruptcy. CPA was sent notice of her bankruptcy on May 2, 2013. (Dkt 1, ¶22). The information in the notice provided by the bankruptcy court in May 2013 did not automatically match CPA's records when run against the accounts and as such was not identified with the plaintiff's account. See Defendants' Supplemental Response to Discovery, a copy of which is attached hereto as Exhibit B, p. 4. The information was placed on a "reject report," which gets generated and checked manually by CPA. Id. Because the bankruptcy was not reflected on her account, collection activity continued. See redacted account notes for plaintiff, attached hereto at Exhibit C. On August 20, 2013, plaintiff obtained a discharge of her bankruptcy, which was sent to CPA. *See In re Lanteri*, Case No. 13-04494-RLM-7 (S.D.Ind.Bankr.), Dkt. 18. This time, the bankruptcy was correctly noted on plaintiff's account for

---

was vastly disproportionate to the number of instances where stop texts were received. It was not a class estimate, and certainly was not an admission. It is a distraction, as are the panoply of unsupported misstatements in plaintiff's brief. Defendants submit that their decision not to engage in addressing each irrelevant diversion with similar tone should not be considered an acceptance of their veracity.

the first time (see entry dated August 21, 2013).  Ex. C.  Thereafter, **CPA never called plaintiff after the bankruptcy was noted in the account**; the last call CPA placed to plaintiff was on August 14, 2014.  See relevant page from dialer call log, showing last call being placed on August 14, 2013, attached hereto as Exhibit D

CPA has explained repeatedly and consistently that the information available in its records, based upon the facts of this case, show that class treatment is inappropriate.  See Ex. B, Dkt. 53, 61. 62, 64, 93, 97, and 99.  Plaintiff fails to meet her burden under FRCP 23.  Instead, she heaps together impermissibly broad categories of unrelated persons incapable of and inappropriate for class treatment.

## CLASS DEFINITIONS

Plaintiff seeks to represent two classes:

**TCPA Stop Texting Class**:

(1) All persons within the United States (2) to whose cellular telephone number (3) CPA sent a text message in an attempt to collect an alleged debt (4) using its vendor, RingClear (5) within four years of September 8, 2013 (6) where the cellular phone owner previously replied to the text message with the message to stop, which includes, but limited to: (a) "STOP TEXT"; (b) STOP CALLIN"; (c) "STOP SENDIN"; "PLEASE STOP"; (e) PLZ STOP"; (f) the first 2 letters of the message "RE" followed by 2-non alpha characters, followed by the exact phrase "STOP" (such as "RE:|Stop").

**TCPA Bankruptcy Stay Class**:

(1) all persons in the United States (2) to whose cellular telephone number (3) CPA called in an attempt to collect an alleged debt (4) using its vendor LiveVox; (5) within four years of September 8, 2013 (6) during the period of an automatic stay as ordered by a Bankruptcy Court, or after the alleged debt was discharged in bankruptcy.

Plaintiff's Memorandum in Support of Plaintiff's Amended Motion for Class Certification, (Dkt. 150, p. 3).  All essential changes to the proposed classes have been underscored for comparison to the previously rejected fail-safe sub-classes.

Plaintiff no longer seeks to certify the below class which the Court held to be an improper fail-safe class.

> **[Former proposed] TCPA Class**:
>
> (1) all persons in the United States (2) to whose cellular telephone number (3) CPA sent a non-emergency telephone call (4) using an automated telephone dialing system or an artificial or prerecorded voice (5) within four years of the complaint (6) where CPA did not have express consent to call said cellular telephone number or where consent had been revoked for any such calls.

(Dkt. 103). As discussed below, both of the revised proposed classes remain improper fail-safe classes.

## ARGUMENT

Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013). The party seeking class certification bears the burden of showing that the requirements of Rule 23 are satisfied. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 614 (1997). Failure to meet any one of the requirements of Rule 23 precludes class certification. *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 596 (7th Cir. 1993). Plaintiff must demonstrate, with evidence, that Rule 23(a)'s requirements of adequacy, commonality, typicality, and numerosity of representation are met.

Plaintiff must also prove that the putative class falls within one of the three categories set forth in Rule 23(b). *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550 (2011)(stating that Rule 23 does not merely provide a pleading standard; evidence is required); *Amchem*, 521 U.S. at 613–14. Notably, a district court should look beyond the allegations contained in the complaint and require evidence that the elements of Rule 23 have been met. "[A] district court must make whatever factual and legal inquiries are necessary to ensure that requirements for certification are satisfied before deciding whether a class should be certified, even if those considerations overlap the merits of the case." *American Honda Motor Co., Inc. v. Allen,* 600 F.3d 813, 815 (7th Cir. 2010) (citing *Szabo v.*

*Bridgeport Machines, Inc.,* 249 F.3d 672, 676 (7th Cir. 2001)).   "The proposition that a district judge must accept all of the complaint's allegations when deciding whether to certify a class cannot be found in Rule 23 and has nothing to recommend it. * * * Before deciding whether to allow a case to proceed as a class action, a judge should make whatever factual and legal inquiries are necessary under Rule 23." *Szabo v,* 249 F.3d at 675–76.   A rigorous analysis and consideration of the factual and legal issues comprising the plaintiff's cause of action are necessary to determine whether Rule 23 is satisfied.  *Gen. Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 160–161 (1982).   Accordingly, this Court is free to make a preliminary inquiry into the merits to resolve discovery issues related to class cert. *See, e.g., Szabo,* 249 F.3d at 676.  *See also, West v. Prudential Securities, Inc.,* 282 F.3d 935, 938 (7th Cir. 2002).

## A.     The "Stop Texting" Class fails because it is an impermissible fail-safe class

Plaintiff's Stop Texting TCPA class is defined as follows:

> (1) all persons within the United States (2) to whose cellular telephone number (3) CPA sent a text message in an attempt to collect an alleged debt (4) using its vendor, RingClear (5) within four years of September 8, 2013 (6) where the cellular phone owner previously replied to the text message with the message to stop, which includes, but limited to: (a) "STOP TEXT"; (b) STOP CALLIN"; (c) "STOP SENDIN"; "PLEASE STOP"; (e) PLZ STOP"; (f) the first 2 letters of the message "RE" followed by 2-non alpha characters, followed by the exact phrase "STOP" (such as "RE:|Stop").

It is well settled that fail-safe classes are impermissible.  *See, e.g., Messner v. Northshore Univ. HealthSystem,* 669 F.3d 802, 825 (7th Cir. 2012) ("the problem of the 'fail-safe' class: one that is defined so that whether a person qualifies as a member depends on whether the person has a valid claim"); *Randleman v. Fid. Nat. Title Ins. Co.,* 646 F.3d 347, 352 (6th Cir. 2011) (improper fail-safe class is one that includes only class members that are entitled to relief); *Adashunas v. Negley,* 626 F.2d 600, 604 (7th Cir. 1980) (improper fail-safe class is only bound by a favorable judgment, but not an adverse judgment).

The reason why fail-safe classes are improper is because fail-safe classes only exist if liability is proven. *Randleman*, 646 F.3d at 352 ("Either class members win or, by virtue of losing, they are not in the class and, therefore, not bound by the judgment."). Put another way, a fail-safe class is improper because it precludes membership unless the proposed class member can establish liability against the defendant. *Kissling v. Ohio Cas. Ins. Co.*, 2010 WL 1978862, *2 (E.D. Ky. 2010).

The proposed class is improper because plaintiff seeks to represent individuals who revoked consent by telling CPA to "stop" sending text messages:  "where the cellular phone owner previously replied to the text message with the message to stop . . . ."  While the proposed amended class definition removes the absence of "consent", it is otherwise virtually identical to the proposed class that was rejected by the Court as a fail-safe class: "where CPA did not have express consent to call said cellular telephone number or where consent had been revoked for any such calls."

In order to be a member of plaintiff's proposed class, the person first must be entitled to relief under the TCPA.  The proposed amended class definition constitutes is a "win or be excluded" class.   Courts have denied class certification to nearly identical fail-safe TCPA class definitions as the one plaintiff seeks here.  *See, e.g., Sauter v. CVS Pharmacy, Inc.*, 2014 WL 1814076, *8 (S.D. Ohio May 7, 2014) (plaintiff's seeking to represent those that never gave consent and those that revoked consent were fail-safe classes); *Taylor v. Universal Auto Group I, Inc.*, 2014 WL 6654270 (W.D. Wash. 2014) (denying class certification of TCPA class on fail-safe grounds on class including calls made "without the recipient's prior express consent"); *Zarichny v. Complete Payment Recovery Services, Inc., et al.*, 80 F.Supp. 610 (E.D.Pa. 2015)(striking the class allegations because they include the ultimate determinative factor of calls being made "without the recipients 'prior express consent'"); *Balschmiter v. TD Auto Finance, LLC*, 303 F.R.D. 508 (E.D. Wis. 2014) (denying class certification of TCPA class on fail-safe grounds on definition).

Notably, this Court previously denied plaintiff omnibus (fail-safe) proposed class definition as follows:

> The Defendants argue, correctly, that this is an impermissible fail-safe class. A fail-safe class is "one that is defined so that whether a person qualifies as a member depends on whether the person has a valid claim. Such a class definition is improper because a class member either wins or, by virtue of losing, is defined out of the class and is therefore not bound by the judgment." Messner v. Northshore Univ. HealthSystem, 669 F.3d 802, 825 (7th Cir. 2012).
>
> * * *
>
> Because the class definition proposed by the Plaintiff in essence tracks the language of the statute that she alleges the Defendants violated—therefore defining a class member as someone as to which the Defendants violated the statute—it is a failsafe class and, as such, cannot be certified.

(Dkt. 130, p. 2).

Similarly, the proposed class definition still parrots the provisions of the TCPA. Generally speaking, a TCPA violation may exist if the following takes place: a text sent to (1) persons in the U.S.; (2) on a cell phone; (3) for non-emergency purposes; (4) using an automated telephone dialing system (which includes SMS/text messages) or an artificial pre-recorded voice; (5) without prior express consent. See 47 U.S.C. § 227(b)(1)(A). Plaintiff's proposed class merely alters the fifth element by inserting the phrase "stop" (revocation of consent) for the absence of prior express consent.

To recap, the putative class member is improper because either in the class (in which case the elements of the TCPA are satisfied through the purported revocation of consent) or excluded (in which case one or more of the elements of the TCPA are not satisfied, most notably, the revocation of consent through texting "stop"). As discussed above, the proposed definition is improper, and the motion should be denied on that basis alone.

**B.     The Proposed Bankruptcy Stay Class is also an Impermissible Fail-Safe Class.**

Plaintiff's prior reply brief proposed a sub-class of persons who were subjected to alleged violations of bankruptcy stays by way of text messages. The Court's order did not address this

proposed amended class definition because it was raised by plaintiff's reply brief. (Dkt. 137, p. 3, referencing Dkt. 119).  The classes were originally defined by plaintiff as follows:

> **Subclass B: TCPA Bankruptcy Stay Sub-Class**
>
> (1) All persons within the United States (2) to whose cellular telephone number (3) CPA sent a non-emergency telephone call via text message (4) using an automatic telephone dialing system or an artificial prerecorded voice (5) within four years of the complaint (6) during a period of an automatic stay as ordered from a Bankruptcy Court.

(Dkt. 119).   This proposed class has been modified as follows:

> **TCPA Bankruptcy Stay Class**:
>
> (1) all persons in the United States (2) to whose cellular telephone number (3) CPA called in an attempt to collect an alleged debt (4) using its vendor LiveVox; (5) within four years of September 8, 2013 (6) during the period of an automatic stay as ordered by a Bankruptcy Court, or after the alleged debt was discharged in bankruptcy.

(Dkt. 150, p. 3).

In short, membership in or exclusion from the class is established by whether a person's cellular phone was autodialed "during the period of an automatic stay as ordered by a Bankruptcy Court, or after the alleged debt was discharged in bankruptcy."   As the Court has previously explained, the proposed bankruptcy stay class is an impermissible fail-safe class because it "defin[es] a class member as someone as to which the Defendants violated the statute . . . ."  (See Dkt. 137, p. 2).  Here, just as the proposed "stop" class, a putative class member is hypothetically a member of the proposed class if he or she  received a "text message (4) using an automatic telephone dialing system or an artificial prerecorded voice (5) within four years of the complaint (6) during a period of an automatic stay as ordered from a Bankruptcy Court.

## C.    Plaintiff fails to establish the elements of Rule 23(a).

Even assuming prerequisite TCPA classes have been properly pled, the evidence fails to establish the four elements required under Rule 23(a).  Rule 23(a) requires plaintiff to prove, using

evidence, the following elements: adequacy, typicality, commonality, and numerosity.  *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2550 (2011).  A plaintiff seeking to represent a class has the burden of proving that the proposed class meets these four requirements. *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006).  A failure to satisfy any of the four requirements precludes class certification.  *Harriston v. Chicago Tribune Co.*, 992 F.2d 697, 703 (7th Cir. 1993).  These four requirements "effectively 'limit the class claims to those fairly encompassed by the named plaintiff's claims.'"  *Wal-Mart*, 131 S.Ct. at 2550, (citations omitted).

      **1.**       **Plaintiff and her counsel are inadequate.**

It is settled that adequacy of representation is the quintessence of due process in class actions. 2 Newberg on Class Actions §4:47 (4th ed.)  It is plaintiff's burden to establish each element under Rule 23, including that she and her attorneys meet the adequacy requirement of Rule 23(a)(4).  The evidence here demonstrates that plaintiff and her counsel are inadequate.  First, plaintiff lacks Article III standing, which presents a defense unique to her and fatal to class certification.  Second, plaintiff and her counsel, at the outset of this case, entered into an engagement arrangement that is impermissible and renders them both inadequate.

### *Plaintiff lacks Article III standing, and therefore cannot adequately represent the classes she seeks to represent*

The class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."  *Wal-Mart*, 131 S. Ct. at 2550 (citation omitted).  In order to justify a departure from that rule, "a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members."  *Id.* That is not the case here because Plaintiff lacks standing to bring the instant TCPA claims, and this defense renders her inadequate.

Since the prior briefs were filed, the Supreme Court articulated that Article III standing requires a concrete injury even in the context of a statutory violation. *Spokeo, Inc. v. Robins*, No. 13–

1339, 136 S.Ct. 1540 (U.S. May 16, 2016).   In *Spokeo*, the Court outlined the framework of the complete standing analysis courts should use to determine whether an injury in fact has been alleged. "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is concrete and particularized' and 'actual and imminent, not conjectural or hypothetical.'" *Id.*; *Lujan v. Defenders of Wildlife,* 504 U. S. 555, 560 (U.S. 1992)(internal quotation marks omitted). For a plaintiff to have standing, he or she plead and prove an injury in fact that is concrete. *Id.* at 1548. A concrete injury is a real injury that actually exists.  *Id.*  It is not abstract; yet, to be concrete, the injury need not be tangible. *Id.* at 1548-1549. In addition to tangible injuries, intangible injuries can still be considered concrete. *Id.* at 1549.

The Supreme Court instructs: "in determining whether an intangible harm constitutes injury in fact, both history and the judgment of Congress play important roles." *Id.*  Further, the Supreme Court notes that while Congress can elevate injuries to be legally recognizable by statute, "Congress' role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right." *Id.*

Plaintiff here did not suffer a concrete injury by receiving two text messages from CPA. Plaintiff claims that these two text messages incurred her damages of "diminished cellular telephone battery life, and wasted data storage capacity on Plaintiff's cellular telephone."  A copy of the relevant pages from plaintiff's deposition are attached hereto as **Exhibit F**; see pages 36:11-12. Plaintiff was unable to place a dollar value amount on any of these alleged damages.  Id., pp. 36:16-25, 37:1-5).  The claims are based upon the sending of one text.

Courts have recently rejected nearly identical claims and held that these types of intangible damages claims as *de minimus* and insufficient to satisfy Article III's standing requirements. *Olmos v. Bank of America*, N.A., 2016 WL 3092194 *4 (S.D. Cal. June 6, 2016); *Hernandez v. Path, Inc.*, 2012 WL 5194120  *2  (N.D.  Cal.  Oct.  19,  2012);  *Smith  v.  Aitima  Med.  Equip.,  Inc.*,  No.

EDCV1600339ABDTBX, 2016 WL 4618780 *4 (C.D. Cal. July 29, 2016).  Where there is nothing more than a *de minimus* and non-systemic injury, there is no standing in a TCPA case.

The plaintiff in *Olomos* claimed TCPA violations based on two text messages to her cell phone alleging that they consumed her battery life and diminished the use and enjoyment of the cellular telephone plans. 2016 WL 3092194 at *4.  The court held that plaintiff did not have a concrete injury finding the fact "that [p]laintiff received two short text messages insufficient to convey standing because the loss of battery life and bandwidth as a result of these two messages was *de minimis*." *Id.* Similarly in *Hernandez,* plaintiff's alleged injury was "diminished mobile device resources, such as storage, battery life, and bandwidth" after downloading an application on his cellular phone. 2012 WL 5194120 at *2.  The court stated that the "specific harm caused by diminished resources of which Plaintiff complains is de minimis: depletion of 'two to three seconds of battery capacity.' " *Id.*  Evaluating *Olomos* and *Hernandez,* the court in *Smith,* also found that claims of battery drainage, aggravation, and nuisance resulting from a single phone call alleged to be in violation of the TCPA was a *de minimus* injury not sufficient to convey standing.  2016 WL 4618780 at *4.  Given the fact that the plaintiff in had received only one call, the *Olomos* court also rejected plaintiff's request to amend the complaint concluding that she would not be able to allege more than a de minimus injury.  *Id.*

### *Plaintiff and her counsel have entered into an engagement that renders both of them inadequate*

Plaintiff and her counsel have an engagement agreement entitled "Class Action Authorization," a copy of which is attached hereto as **Exhibit E**.  In it, plaintiff agreed to the following provision:

> **Exception for Individual Settlement Agreement Against Attorneys' Advice:** If Client [Lanteri] abandons the class and settled on an individual basis against the advice of Attorneys, Client shall be obligated to pay Attorneys their normal hourly rates for the time they expended in the case, and shall be obligated to reimburse the Attorneys for all expenses incurred.

Ex. E.  The hourly rates for the attorneys range between $200 and $495 per hour.  Id.

At her deposition, plaintiff initially explained that there are three law firms representing her in this case, but that she did not know how they were going to get paid.  Exhibit F, p. 59.  She also explained that while she did not know if she had an obligation to pay them, she was not paying them, and she was unaware of any circumstances under which she would have to pay them.  Id.  She did not know what the attorneys' hourly rate was, and did not recall signing any agreements with her attorneys.  Id, at p. 60.  She also did not recall the terms of her engagement ever being discussed with her.  Id.

Upon being given the Class Action Authorization, plaintiff was reminded that she did sign an engagement, and she was reminded of her attorneys' rates.  Id. at pp. 62-63.  She explained that she never discussed the paragraph entitled "Exception for Individual Settlement Agreement Against Attorneys' Advice" with anyone, never discussed it with any attorneys, and was never advised to ask any other attorney about the provision.  Id. at pp. 63-64.  Plaintiff acknowledged that there was never a time in this litigation where she could afford to pay an attorney in this case.  Id. at p. 60-61.

Defendants disclosed an expert[3] in this case, Donald R. Lundberg, the Deputy General Counsel of Barnes & Thornburg LLP and the former Executive Secretary of Indiana's Supreme Court Disciplinary Commission.  Mr. Lundberg's opinions are attached hereto as **Exhibit G**.  Mr. Lundberg's opinions are well founded, well-reasoned, and include the following:

- the "practical effect of the fee provision, including the exception for Lanteri accepting an individual settlement against attorney's advice, is to impose upon Lanteri a significant financial penalty if she were to accept a settlement for herself contrary to the advice of her attorneys";

---

[3] Defendants are mindful that the Court explained previously that it will not consider experts.  Defendants certainly agree that the Court can evaluate the implications of the engagement without considering Mr. Lundberg's opinions.  They are included here in order to preserve the evidentiary record for any potential Rule 23(f) considerations because this argument was not previously decided.

- by so heavily taxing plaintiff's decision to settle individually, "for all practical purposes, the lawyer has taken away the client's choice to settle without the lawyer's permission";

- under Indiana's Rules of Professional Conduct, "[i]n any contingent fee case, the lawyer must accept the risk that the client will accept a settlement on terms that are uneconomical for the lawyer";

- the terms of the Class Action Authorization violate Indiana Rule of Professional Conduct 1.2(a) "because they have the practical effect of depriving Lanteri a meaningful right to decide to settlement her claim without the agreement of her attorneys"; and

- the terms because, in the event she settled individually against the advice of her counsel, the fee provisions "so far exceed the likely value of any such settlement to Lanteri as to likely also violate Indiana Rule of Professional Conduct Rule 1.5(a).

Ex. G.

Mr. Lundberg's multiple conclusions concerning the relevant Rules of Professional Conduct alone are alarming. Admittedly, the existence of an ethical violation is not *per se* disqualifying. Mr. Lundberg, however, also opined on the potential conflict of interest with respect to the putative class, making plaintiff's interest adverse to those of the class. In this regard, Mr. Lundberg explained:

- Lanteri has become "the servant of the case or the lawyers, not the master of the case as the Rules of Professional Conduct contemplate";

- "Lanteri's subservience to the case and the attorneys has the potential to make her an unwilling pawn in a litigation she no longer wishes to pursue to the detriment of her role as committed class representative; and

- the "practical impact of the fee provisions of the Class Action Authorization is to tie Lanteri to a case that unknown and unanticipated developments might cause her to regret," which is improper, "as in any other case where the client's lawyer unethically demands that the client cede settlement authority to the lawyer."

Ex. G.

Anything "pertinent to counsel's ability to fairly and adequately represent the interests of the class" bears on the class certification decision. Fed.R.Civ.P. 23(g)(1)(B). While ethical misconduct is not automatically disqualifying, the Seventh Circuit specifically "rejects the suggestion … that only misconduct directly harming the class is relevant to class certification decision." *Reliable Money Order,*

*Inc. v. McKnight Sales Co., Inc.*, 704 F.3d 489, 499 (7th Cir. 2013)  Rather, it explained that unethical conduct can be disqualifying in instances where it "raises a 'serious doubt' about the adequacy of class counsel." *Id.*

As Mr. Lundberg's opinions underscore, the burdens on the relationship here are troubling, even if they were ethically permitted.  The Seventh Circuit has explained that the relationship between class representative and class counsel can raise adequacy challenges where, for example, class counsel exerts inappropriate control over the class representative.  *See Redman v. RadioSchack Corp.*, 768 F.3d 622 (7th Cir. 2014).  In *Redman*, the class representative was employed by the class counsel.  *Id.* at 638.  The Seventh Circuit explained that class representatives "are the representatives of the class—fiduciaries of its members—and therefore charged with monitoring the lawyers who prosecute the case on behalf of the class (class counsel)." *Id.*, *quoting Eubank v. Pella*, 753 F.3d 718 (7th Cir. 2014).  The Seventh Circuit further explained that there "ought therefore to be a genuine arm's-length relationship between class counsel and the named plaintiffs" and "remind[ed] the class action bar of the importance of insisting that named plaintiffs be genuine fiduciaries, uninfluenced by family ties (as in *Eubank*) or friendships." *Id.*

Plaintiff's counsel has improperly taken, and plaintiff has improper ceded, total control over the evaluation of this case as a possible individual case.  Plaintiff has been put in a position where she cannot adequately monitor the class counsel by virtue of the fact that she cannot, if appropriate, walk away from this case on an individual basis.  Instead, even if she is of the opinion that her lawyers are inadequate for the class, she cannot settle individually.  If she and her lawyers have a disagreement that renders her incapable or unwilling to proceed (such as her belief that a class may not exist or because she believes that Defendants did not violate the TCPA, or if she simply loses the taste for the litigation), she must remain tied to this case as an unwilling "pawn" for the class (and class counsel) or receive no personal benefit.  This arrangement, where plaintiff is potentially

put in a position to be forced to represent the class against her own desire in order to personally benefit, puts her interests at odds with those of the class.

Plaintiff's counsel obviously stands to gain from a class recovery in a hugely disproportionate manner as compare to the class members and plaintiff. Yet the agreement between plaintiff and her counsel is that only class counsel has the final say on whether the case may settle individually. It is obvious that plaintiff's counsel intended to bind plaintiff to pursue this claim on behalf of a class unless and until class counsel has been denied the class relief, and counsel denied the accorded recovery. That is not permitted, where class representatives are "charged with monitoring the lawyers" and not the other way around. *Redman*, 768 F.3d at 638.

This arrangement is no different than where a family member, or an employment relationship, or a friendship, influences a class representative to curry influence and favor for the potential windfall for the plaintiff's counsel to the detriment of the representative's control of the case. In those instances, class representatives are influenced to get a huge recovery for the class counsel in light of their desire to reward their employer, family member of friend. Under these circumstances courts have found class members to be inadequate. *See, e.g., Susman v. Lincoln Am. Corp.*, 561 F.2d 86 (7th Cir. 1977) (brother of class attorney inadequate); *Helfand v. Cenco*, 80 F.R.D. 1 (N.D. Ill. 1977) (plaintiffs who have shown no interest in suit and whose son is class counsel inadequate representatives); *Cohen v. Bloch*, 507 F.Supp. 321 (S.D. N.Y. 1980) (plaintiff inadequate where plaintiff's personal commitment to action doubtful, counsel, who was husband of plaintiffs' stepdaughter, had represented stepdaughter in earlier derivative action, and family relationships indicated that attorney's interest as counsel was real interest in question).

Here, just as the above cases, plaintiff has placed complete control of this case to class counsel, without any limitation, under and all circumstances, anticipated or unanticipated. In contrast these examples, plaintiff's testimony shows that she is not a "zealous" class representative.

*Malchman v. Davis*, 761 F.2d 893 (2d Cir. 1985) (plaintiffs who are brother of class counsel, sister of chauffeur of class counsel, mother-in-law of class counsel were found to be adequate where depositions revealed that the plaintiffs were "zealous" class representatives).

There is no question that plaintiff, as she conceded at her deposition, could never afford to pay anything in attorneys' fees. There is no question that plaintiff, as she concedes in her motion, seeks very little in the way of money for herself. There is therefore no doubt that the class counsel stands to gain huge amounts of money, with minimal risk, by pursuing this matter as a class and can proceed without the risk of real monitoring by the class counsel. This arrangement is disqualifying.

**2.    Plaintiff's claims are not typical to those of the putative class members because plaintiff is susceptible to the unique defense of lack of standing.**

Typicality ordinarily exists when each class member's claim arises from the same course of events and each class member makes similar arguments to prove the defendants' liability. "Under the typicality analysis, 'a plaintiff against whom the defendants have a defense not applicable to other members of the class is not a proper class representative.'" *Wright v. Family Dollar, Inc.*, 2010 WL 4962838 (N.D. Ill. Nov. 30, 2010). *Quality Management and Consulting Services, Inc. v. SAR Orland Food, Inc.*, 2013 WL 5835915, *4 (N.D. Ill. Oct. 30, 2013) held that:

> the typicality requirement is generally determined by reference to the defendants' actions alone. … But it is also true that "[t]he presence of even an arguable defense peculiar to the named plaintiff or a small subset of the plaintiff class may destroy the required typicality of the class as well as bring into question the adequacy of the named plaintiff's representation."

*Id.*, quoting, *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 726 (7th Cir. 2011). *See also, Randall v. Rolls-Royce Corp.*, 637 F.3d 818, 824 (7th Cir. 2011) (named plaintiff with claims weaker than those of other class members is not an adequate class representative).

While Defendants explain above that plaintiff's lack of standing renders her inadequate, if the Court opts not to make a merits determination at this stage, this defense thwarts class

certification[4].  Even if the Court does not decide the merits of whether a *de minimus* injury was sufficient to establish standing, the plaintiff's *de minimus* injury and claims of annoyance differ from the class.  The class received anywhere from one to six texts, according to Mr. Biggerstaff.  (Dkt. 150-2).  This defense, because it is "even arguable," is unique to the plaintiff, demonstrated by the evidence in this case, and renders her atypical.

### 3. Plaintiff has failed to present evidence sufficient to show she satisfies the commonality requirement because she does not provide evidence of common answers to the issues presented.

The Court is not required to accept plaintiff's assertions and must examine whether common issues exist.  According to the Supreme Court, Rule 23(a)(2)'s commonality requirement is easy to misread, since any competently crafted class complaint literally raises common questions."  *Wal-Mart*, 131 S. Ct. at 2551.  It "is not the raising of common questions—even in droves—but, rather the capacity of a classwide proceeding **to generate common answers**" that is pertinent to the certification issue.  *Id.* (emphasis added).  Plaintiff's motion, and plaintiff's expert, does not adequately define what common group of persons similarly situated, with common factual questions generating common factual answers, plaintiff seeks to represent.  Indeed, plaintiff fails to even frame or present the common answers she intends to prove.

Plaintiff argues essentially two basis for her personal claims: (1) that she received texts after telling RingClear to "stop" and (2) that she received calls after filing for bankruptcy.  Here, there is no class wide evidence that establishes common answers to these personal issues "in one stroke."  *Wal-Mart*, 131 S. Ct. at 2551.  There is no evidence as to what RingClear did, or did not do, with respect to continuing to send texts.

---

[4] As recently explained in *Blair v. The CBE Group, Inc.*, when a plaintiff is subject to an even arguable defense, it also presents individual issues which predominate and defeats commonality.  309 F.R.D. 621 (S.D.Cal. 2015).  The *Blair* court considered whether certification of a TCPA class was appropriate, and defendant argued that the plaintiffs' prior consent thwarted certification.  The court "emphasize[d] that at the certification stage, the ultimate merits of the issue of consent [was] not currently before the Court [and instead] the Court must determine whether the issue of consent is a common issue with a common answer that predominates over any individual issues."  Id., at 630.

In response to RingClear's direction to reply "STOP" to opt-out from future texts, plaintiff responded "stop", all in small case letters.  See screen captured shot of texts hereto as **Exhibit I**. The class she purports to represent present a wide array of responses, including vague reference in the class definition that it is in fact "not limited to" the instances presented.  Biggerstaff has melded together what he believes to be a group of people that were subject to the same factual circumstances, but the exhibits to his report demonstrate that is not the case.  It appears, although it is not at all clear from his opinions, that there are 210 people who, like plaintiff, responded with "stop" in small case letters.  Yet plaintiff purports to represent some ever shifting group of persons without any explanation as to what RingClear did, or why.  This haphazard approach is not appropriate for class treatment.  Similarly, the fact that the class may all be subject to an alleged TCPA violation alone is insufficient to establish commonality.  *See Buonomo v. Optimum Outcomes, Inc.*, 301 F.R.D. 292, 297 (N.D.Ill. 2014) (explaining class fails to "because his 'wrong party' claim lacks the same 'essential characteristics' as the claims of actual debtors included in the proposed class)(citation omitted)

### a.    Plaintiff's post-bankruptcy calls are not common to the class.

With respect to the bankruptcy issue, the evidence shows at best that plaintiff filed for bankruptcy, a notification was sent to CPA, and calls continued because CPA did not match the court notification with plaintiff's account.  Later, upon receiving the discharge order, CPA did match the account, updated it as included in bankruptcy, and ceased all collections.  Accordingly, there are no calls to plaintiff after CPA's records indicate receiving notice of a bankruptcy (and plaintiff does not contend otherwise).

CPA argued in response to plaintiff's previous motion to certify that the discovery process that its records revealed only 11 instances[5] in which phone numbers on accounts were sent by it to the dialer after it received notification of a bankruptcy or cease request was noted.  CPA explained that to the extent there were calls placed by the dialer *after its records indicate a possible bankruptcy or cease request*, such a set of circumstances are not common to the plaintiff's situation.  CPA's collectors can use one of multiple codes when a consumer informs them of a bankruptcy.  Ex. A, ¶ 9.  Those codes are also used in instances where consumers request calls cease for other reasons, including referring to attorneys, deceased consumers, or in some instances refusing to pay or becoming abusive.  Id.  When those codes were run against the dialer, there were approximately 4,340 persons who were called by the dialer after the codes were entered.  Ex. A, ¶ 10.  Plaintiff is not one of those persons, obviously, as plaintiff was not called after the account was noted included in bankruptcy. To recap, this is not a case where CPA received and noted a bankruptcy and *continued calling the plaintiff.*  Rather, this is a case where CPA received notification of a bankruptcy, the notice did not match, and calls continued.

At his deposition, plaintiff's expert, Robert Biggerstaff, explained that his conclusion that 4,340 persons were called during the pendency of a bankruptcy stay was based solely upon the list provided to him.  See relevant portions of the Deposition of Robert Biggerstaff, attached hereto as **Exhibit H**, pp. 47-50.  Biggerstaff testified that he did not know "what rules were in place on the receiving side of what caused a code to be placed," but he "would imagine that a bankruptcy notice or notice that a bankruptcy has been filed or underway would come from a consumer."  Id., p. 48. He does not know whether plaintiff was included in that list.  Id., p. 48-49.

---

[5] This is instance where plaintiff totally misstates what CPA said in its briefs on the underlying motions.  CPA was explaining that the information plaintiff sought was insufficient to demonstrate a class exists.  In that argument, CPA explained that if there were more than 11 accounts called *after the notation of bankruptcy*, but that this issue was not common to the plaintiff.  Notwithstanding, the dialer information was ordered produced, and it demonstrates that there can be no class here.

Biggerstaff is also "not familiar with the data practices" of CPA, so he is "not in a position to say what degree of reliability [CPA's] data has." Id., at 49-50. Plaintiff has not deposed anyone at CPA, so Biggerstaff obviously could not be familiar with CPA's data practices. Biggerstaff does not know if the codes would have been entered because someone just called in and said she was filing for bankruptcy, and he did not compare those persons to public bankruptcy filings to see if any actually filed for bankruptcy. Id., p. 50. In short, Biggerstaff has no idea who, if anyone, actually filed for bankruptcy out of the accounts he identified.

Because CPA's records could not be used to identify persons *like the plaintiff*, whose bankruptcy notification was received but not processed appropriately, plaintiff sought different information uncommon to her. As disclosed in the ESI process and as explained above in this motion, CPA has multiple codes that could be used by collectors when they learn of a bankruptcy. Those codes, however, are used for other closing actions as well, including hostile consumers, deceased consumers, and other issues. As such, plaintiff has failed set forth a class of persons with answers totally unrelated to those related to the plaintiff.

There is not a common answer to the issue presented with respect to the *unique, fact specific* issue she presents – that CPA received notice of a bankruptcy that was not coded properly, and as result, calls continued. The list is instead a panoply of persons she claims filed for bankruptcy (which as explained below is inaccurate without an individualized inquiry), who later received calls. But those persons in many instances have not filed for bankruptcy and the code may have been entered for a variety of other reasons. Under any circumstances, the reasons the calls continued has nothing to do with the reasons the calls to the plaintiff continued – *because her bankruptcy notification was not matched to her account*. Whatever the underlying issues facing other debtors who received calls, they are not common to the *unique and specific* facts related plaintiff's calls.

        **b.**        **The Stop texting class claims are not common to the class.**

The "'Stop' Texting Class" similarly fails.  Plaintiff has again failed to articulate the common answer to the issue she presents – how and why she and others purportedly similar to her receive texts after they acted in the same manner in opting out.  Plaintiff's expert explained in his initial expert report that he found 24,601 incoming texts that RingClear internally identified as "opt-out" messages.  He then identified an additional 3,001 incoming text messages that he determined were requests to "opt-out" based upon his search of the string "stop" in incoming messages, and he concludes that RingClear did not recognize these as "opt-out" requests.  He now opines, in response to the criticisms set forth in Defendants' prior opposition brief, that the number should be 7,291.  But his report demonstrates that these are not persons who texted "stop", common to plaintiff.  They are persons who texted any variation that "includes, but is not limited to,  (a) "STOP TEXT"; (b) STOP CALLIN"; (c) "STOP SENDIN"; "PLEASE STOP"; (e) PLZ STOP"; (f) the first 2 letters of the message "RE" followed by 2-non alpha characters, followed by the exact phrase "STOP" (such as "RE:|Stop"."  The very fact that this definition includes, but is not limited to, the variations set forth underscores the lack of commonality to the plaintiff and each other.

It is not clear from his testimony or his now supplemental report what plaintiff and Biggerstaff claim was the issue or problem giving rise to RingClear's failure to suppress the texts.  Biggerstaff has never spoken with anyone from RingClear about these records of how it determines what constitutes an "opt-out" for its internal coding.  Ex. H, p. 38.  Biggerstaff also did not recall with any specificity any other examples of what constituted an "opt-out" that RingClear did not recognize, with the exception of "Re:Stop," which was referred to in his original report.  Ex. H, pp. 40-41.  He did not know if any of the included messages said "don't stop," but if it such a message was included, he tried to explain it away by explaining he "would interpret that as someone as saying 'don't' and 'stop' as opposed to 'I want these to continue, don't stop sending them."  Ex. H, p. 41.

This conclusion from an expert is not the type of common answer that this Court can determine is reliable.

The TCPA is not so fickle with respect to what constitutes revocation of consent, as explained below on the predominance of individualized inquiries.  In any event, plaintiff has presented no evidence as to why RingClear continued to allow texts to go to plaintiff after she opted out.  She has not identified the common issue (for example, why texts continued to the plaintiff).  Plaintiff therefore cannot present the common answer (what RingClear failed to do).

What is clear is that Biggerstaff's vague interpretation as to what constitutes an "opt-out" is inconsistent with the TCPA, as explained below concerning the need for individualized inquiries.  Plaintiff must do more than present a computer forensic examiner's opinion that he believes persons opted out, without speaking with anyone, based upon a review of uncommon data.  Plaintiff must present evidence of a common issue that can be addressed with a common answer "in one stroke."  She has not, and she cannot.

**C.    Plaintiff failed to prove Rule 23(b)'s requirement that class treatment is a superior method of adjudication because individualized inquiries predominate over any common questions.**

Predominance under Rule 23(b)(3)(a) requires not only that common questions of law and fact exist, but that they "predominate over any questions affecting only individual members." *Amchem*, 521 U.S. at 623–24.  The predominance criterion of Rule 23(b)(3) is far more demanding than the identification of a single common issue, and the movant cannot manufacture predominance by suggesting that only a single issue be certified for class treatment when other individualized issues will dominate or be meaningfully material to the resolution of the absent class members' claims. *Hamilton v. O'Connor Chevrolet, Inc.*, 2006 WL 1697171 at *6 (N.D. Ill., June 12, 2006); *Hyderi v. Wash. Mut. Bk., FA*, 235 F.R.D. 390, 398 (N.D. Ill. 2006).  The need to make individual inquiries has been interpreted as evidence that predominance has not been met. *Thorogood v. Sears, Roebuck and Co.*, 547

F.3d 742, 746–47 (7th Cir. 2008); *Foreman v. PRA III, LLC*, 2007 WL 704478 at *13, 14 (N.D. Ill., March 5, 2007).

Predominance concerns whether the named plaintiff can offer proof on a class-wide basis through her individualized claims. *Fletcher v. ZLB Behring LLC*, 245 F.R.D. 328, 332–33 (N.D. Ill. 2006); *see also Blair v. Supportkids, Inc.*, 2003 WL 1908031, at *4 (N.D. Ill., April 18, 2003). The TCPA's requirements for revocation of consent, coupled with the imprecise approach taken by plaintiff and her expert, renders proof on a class-wide basis impossible for this TCPA Class.

Rule 23(b)(3) requires that the common questions of law and fact predominate over the issues affecting the individual members. *Vigus v. S. Illinois Riverboat/Casino Cruises, Inc.*, 274 F.R.D. 229, 236 (S.D. Ill. 2011). Rule 23(b)(3)'s requirement of predominance is similar to Rule 23(a)'s typicality and commonality requirement, but, it is "far more demanding." *Jamison v. First Credit Servs., Inc.*, 2013 WL 3872171, at *4 (N.D. Ill. July 29, 2013), quoting *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623 (1997). The predominance inquiry mandates that the Court consider how a trial on the merits would be conducted if a class were certified. *Gene and Gene LLC v. Biopay, LLC*, 541 F.3d 318, 326-29 (5th Cir. 2008) (holding that "there is no class-wide proof available to decide consent and only mini-trials can determine this issue."). In reversing the district court's ruling to certify a TCPA class, *Gene* determined that the district court "simply noted a common course of conduct", but failed to determine "whether the common course of conduct provided a class-wide basis for deciding the predominant class issues of fact and law." *Id.* at 326.

Under any of the class definitions in this case, the issue of whether each putative class member revoked consent requires individual inquiries that will result in a series of mini-trials. The recent FCC Order on revocation of consent emphasizes the specific inquiry that must be performed in each instance if someone allegedly revoked consent:

> *When assessing whether any particular means of revocation used by a consumer was reasonable, we will look into the*

> *totality of facts and circumstances surrounding that specific situation*, including, for example, whether the consumer had a reasonable expectation that he or she could effectively communicate his or her request for revocation to the caller in that circumstance, and whether the caller could have implemented mechanisms to effectuate a requested revocation without incurring undue burdens.

*In the Matter of Rules & Regulation Implementing the Telephone Consumer Protection Act of 1991*, FCC 15-72, fn. 233 (July 10, 2015) (emphasis added).  Looking into each specific situation regarding whether consent was revoked makes sense because the FCC "clarified that consumers may revoke consent in any manner that *clearly expresses a desire not to receive further messages* . . ."  *Id.* at ¶63 (emphasis added).

Even before the FCC's recent ruling (which clearly determined that whether consent has been revoked depends on each specific situation), Judge Zagel in the Northern District of Illinois granted a motion to strike a revocation of consent class because "[t]he Revocation of Consent Class fails to satisfy the predominance requirement." *Wolfkiel v. Intersections Ins. Servs. Inc.*, 303 F.R.D. 287, 293 (N.D. Ill. March 5, 2014).  *Wolfkiel* held that the putative class members would not be able to present the same evidence for each class member to make a prima facie showing that he or she validly revoked consent.  *Id.* at 294.  "[T]he individualized inquiries would inevitably predominate over the common questions of fact." *Id.*

Plaintiff's class definitions ignore the FCC's ruling and *Wolfkiel* because plaintiff seeks to represent a nationwide class of people who may have informed CPA of their bankruptcy stay in differing manners and in unique circumstances.  The FCC's ruling requires the Court to analyze the facts surrounding each specific situation where consent was allegedly revoked, either by the content of the text or the facts surrounding the underlying bankruptcy.  Given the evidence here, this is not the type of determination that can be made on a class wide basis.  Further, *Wolfkiel* provided an analysis into why a revocation of consent cannot be certified *before* the FCC even issued its new ruling clarifying that the "totality of facts and circumstances surrounding the specific the specific

situation."  Simply put, both the FCC's ruling and *Wolfkiel* establish that the issue of whether consent was revoked requires a series of mini-trials into each underlying factual scenario.  *See also Conrad v. Gen. Motors Acceptance Corp.*, 283 F.R.D. 326, 330 (N.D. Tex. 2012) (consent to call the proposed class members' cell phone numbers "would necessitate individual inquiries regarding each putative class member's account and the circumstances surrounding each call or contact."); *G.M. Sign, Inc. v. Brink's MFG. Co.*, 2011 WL 248511, at *8-10 (N.D. Ill. Jan. 25, 2011) (there is no predominance as the issue of consent required individual inquiries); *Shamblin v. Obama for America*, 2015 WL 1909765, *12 (M.D. Fla. April 27, 2015) ("predominance is not satisfied based on the looming issue of consent.");  *Chapman v. First Index, Inc.*, 2014 WL 840565, *3 (N.D. Ill. March 4, 2014) (the consent issue requires a case-by-case inquiry so the class fails Rule 23's ascertainability and predominance requirements).

**The TCPA Bankruptcy Stay Class requires individualized inquiries about the existence, the timing, and the type of bankruptcy.**

To the extent plaintiff's theory is that she revoked her prior express consent by simply filing for bankruptcy (and then the bankruptcy court providing CPA notice of the bankruptcy), it fails as a matter of law.  *See In re Runyan*, 530 B.R. 801, 807 (Bankr. M.D. Fla. 2015) (holding that "the TCPA requires—at a minimum—express and clear revocation of consent; implicit revocation will not do.").  To the extent she claims that she told CPA in a letter that she filed for bankruptcy and was represented by counsel (as alleged in the Complaint), it also fails.

The Runyan's similarly argued that they revoked their prior express consent under the TCPA because they told the defendant to contact their bankruptcy attorney with any future questions. *Id.* at 804, 807.  The Runyan's also provided their bankruptcy attorney's name and contact information. *Id.*  The court rejected the plaintiff's claims, holding that TCPA requires an express and clear revocation of consent and "[a]t best, the Runyans implicitly revoked their consent here." *Id.* at 807.

27

As a result, the Court the Runyans' TCPA claim failed because they did not revoke their prior express consent. *Id.* This position is consistent with the FCC's ruling "that consumers may revoke consent in any manner that ***clearly expresses a desire not to receive further messages . . .*" *In the Matter of Rules & Regulation Implementing the Telephone Consumer Protection Act of 1991*, FCC 15-72, ¶63 (July 10, 2015) (emphasis added). Further, the Hobbs Act prevents plaintiff from the challenging the FCC's ruling here. *CE Design, Ltd. v. Prism Bus. Media, Inc.*, 606 F.3d 443, 450 (7th Cir. 2010).

Biggerstaff acknowledged that he did not compare the proposed TCPA Bankruptcy Stay Class to any publicly available information on filed bankruptcies. Ex. H, p. 50. He obviously has no idea if any of those people actually filed for bankruptcy (or when). In reality, a sampling of the 4,340 accounts identified by Biggerstaff reveals that very few actually filed for bankruptcy, and even less filed during the class period.

Attached to this Response at Group Exhibit J[6] are the publicly available bankruptcy docket files for a random sample of the 4,340 accounts Biggerstaff identified as the TCPA Bankruptcy Stay Class. This court may take judicial notice of the contents of court records so long as the facts are not capable of reasonable dispute. *General Electric Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1081-82 (7th Cir. 1997); *see Fletcher v. Menard Correctional Center*, 623 F.3d 1171, 1173 (7th Cir. 2010). The spreadsheet at the beginning summarizes the search results and filings for 100 class member, reviewing every 43rd record as listed in Biggerstaff's report. Those names and addresses were then manually checked against the Pacer records to see if there was a bankruptcy filed in the

---

[6] The summary was prepared by manually reviewing the records which are attached thereto, which is plainly not ministerial. This Court, or counsel, can obviously review these publicly available documents, and will draw the same conclusion. It is painstaking to access Pacer manually, review each filing, and diary the relevant information. For purposes of comparing to those persons identified in the list attached as Exhibit 2 to Biggerstaff's corrected report, the account numbers have been left in. These accounts can be cross referenced to the publicly available information. The list including the addresses has been provided to plaintiff's counsel as a courtesy (his expert obviously has the data), and is of course available to the Court. By agreement, and as in the prior filing, the phone numbers have been redacted at plaintiff's counsel's request. (Dkt. 129).

state of the consumer's residence.  If there was, the bankruptcy was then checked to see if the address matched.

If Biggerstaff had performed this individualized inquiry, he would have learned that very few of the class members whose accounts were flagged by CPA as potentially included in bankruptcy actually filed for bankruptcy in the class period.  Indeed, beginning four and a half years prior to the filing of this lawsuit, there were only 29 bankruptcies filed out of the 100 accounts sampled.  If the review period was expanded to include a time up to December 21, 2015, there were 55 total, barely more than half.  This individualized review shows that the TCPA Bankruptcy Stay Class is unreliable, and would require an individualized inquiry to determine if even a bankruptcy was filed.  Obviously consumers tell CPA that they filed for bankruptcy, or CPA enters the hold code, in instances the majority of which occur when there is no bankruptcy pending.

But the relevant inquiry would obviously not stop there.  The date CPA noted an account as a possible bankruptcy (or cease request or deceased or refusal to pay with abusive consumer) obviously does not reflect the date of filing of bankruptcy.  Plaintiff would therefore then need to manually compare the date of the actual bankruptcy filing to the date the calls were placed to ensure that there were in fact calls placed afterwards.

Finally, one would need to review the bankruptcy to ascertain additional individualized inquiries, such as whether claims may be judicially estopped[7].  Judicial estoppel precludes a party from abandoning positions after they have prevailed on them in earlier litigation.  *See Williams v. Hainje*, 375 Fed.Appx. 625, 627 (7th Cir. 2010).  Any omission in listing the claim would bar a class member from potentially participating in this suit if the claim arose prior to filing for bankruptcy and was not listed, for the claim belongs to the Trustee while the bankruptcy case is open. *See, e.g., Biesek v. Soo Line R.R.,* 440 F.3d 410 (7th Cir. 2006).  The Seventh Circuit also added in *Cannon–Stokes v.*

---

[7] This individualized inquiry applies equally to the text class.

*Potter,* 453 F.3d 446 (7th Cir. 2006), that a debtor is judicially estopped from litigating after the bankruptcy ends; having told the bankruptcy court implicitly that any tort claim had no value, and having received a discharge in response, the debtor is estopped from contending in a later suit that the claim is valuable.

Plaintiff contends that if this sampling is accurate, then there are still "well over a thousand members of the Bankruptcy Class." (Dkt. 150, p. 5). Plaintiff misses the point. This laboring task is required to ascertain who, if any, is in the class. This is not the class, as some of these people may have filed for bankruptcy after calls ceased. Or perhaps they had viable claims and did not list them. Under any circumstances, the task of reviewing the class is not a ministerial one, and cannot be done by computer searches.

Plaintiff's expert did nothing with the bankruptcy data CPA provided. He did not compare it to the publicly available information on bankruptcies despite disclaiming any reliance on or confidence in the integrity of CPA's policies and data. No one from CPA was deposed. As such, the conclusions are totally irrelevant to the ultimate issue here – whether CPA called during the pendency of an actually existing bankruptcy stay. Even if that was a legally cognizable express revocation of consent (it is not), it still fails. The individualized inquiries are overwhelming, and certification should be denied.

**The TCPA Stop Texting Class
requires individualized inquiries on the issue of revocation.**

As with the other class, the TCPA Stop Texting Bankruptcy Class also requires individualized inquiries that require denial of certification. Plaintiff's expert reviewed the RingClear reports to identify this class. Exhibit 1 to Mr. Biggerstaff's supplemental report (Dkt. 150-1) demonstrates why the text class cannot be certified.

Although Biggerstaff's supplemental opinion conveniently removed all of the representative examples of data which Defendants previously pointed out would result in individualized inquiries

and min-trials (see Dkt. 117), there remain able instances that show the need for mini-trials remains. The Court can obviously review and evaluate the record, but following is just a representative sampling of non-responsive messages to CPA (through RingClear) from persons where Biggerstaff has identified where the word "stop" is included in the message:

| Line[8] | Message |
|---|---|
| 31 | Stop :) LOVING MY BABE:) :) |
| 78 | Stop :O#Bitch Please+Dats my attitude |
| 86 | Stop GO GAMECOCKS ! |
| 306 | Stop  Lovin' my boys :) |
| 313 | Stop "MoneyMotivatesMe" |
| 317 | Stop 'Don`t Like Me ? Have A Seat Wit Every One Else Waitin On Me To Give A Fuck ' |
| 329 | Stop *YOLO* |
| 333 | Stop -BLUE EYES |
| 352 | Stop ?Crazy Bitch? |
| 385 | Stop Hillbilly bitch |
| 389 | Stop I love u <3 |
| 391 | Stop ILoveYou |
| 392 | Stop Im All Yours!! |
| 400 | Stop M.I.A. NO I.D. |
| 413 | Stop Only GOD Know |
| 415 | Stop Pistol T |
| 416 | Stop R.I.P Darius |
| 419 | Stop Ruffneck4life |
| 422 | Stop Sexy Gal=) |
| 423 | Stop Sexy Kisha Pooh |
| 426 | Stop Strong woman |
| 429 | Stop THE TRUTH HURTS |
| 430 | Stop The kid cali stay true |
| 440 | Stop dnt tex me no more!!! Stop ?I HATE LAMES? STFU%p_%o?¿ |
| 443 | Stop follow collisionx2 on instagram! |
| 557 | stop ***100%_GRADE_A_THICK*** |

None of these messages appear (on their face) to relate to "stop texting messages", so accordingly, individualized inquires will be required to determine whether these individuals are class members of the universe of potential class members which are identified by plaintiff's expert. While

---

[8] "Line" referrers to the line number from Biggerstaff's Excel spreadsheet.

plaintiff concludes that they can just issue discovery to these people, that concession gives the game away.  Mini-trials are needed, and individualized inquiries predominate.

Additionally, there are numerous instances where putative class members identified by plaintiff's expert responded by asking that RingClear "stop calling" or similar messages.  These messages do not refer to texts, and appear to be concerned instead about calls:

| | |
|---|---|
| 109 | Ok dam  stop calling me |
| 147 | Stop calling |
| 148 | Stop calling  Don't believe me..jus watch |
| 172 | But stop calling me pleasr |
| 182 | He doesnt have this number anymore. Stop calling |
| 189 | I do not have any comcast equipment.stop calling me. |
| 516 | This is not David's  # please stop calling thanks |
| 517 | This is not Deveius please stop calling my phone |
| 524 | This is not devans phone stop calling me |
| 540 | U have the wrong number. Stop calling me. Please |
| 541 | Who ever you are trying to contact I sure in the hell wish u get the right fucking numbeR and stop calling mind. |
| 544 | Wrong  # STOP calling me |

These and other examples would need to be separately examined to determine if this constitutes legal revocation under the TCPA as interpreted by the FCC.  If determined this could legally amount to revocation, these class members (and obviously others from the rest of the thousands of records) would need to offer evidence surrounding their desire and wishes, and the underlying circumstances.

Biggerstaff, however, is not the appropriate (omniscient) adjudicator of what constitutes an express revocation of consent under the TCPA.  To make that determination, and individualized inquiry is required and the underlying evidence should be explained by the entity which utilizes the evidence.  Somewhat remarkably, plaintiff's expert never spoke with anyone at RingClear about its own reports or what they meant.  Equally remarkably, the text class was not identified in terms of persons who were identical to the plaintiff in some manner (i.e., plaintiff's response was recorded by RingClear as "stop" and thus not recognized as an opt-out "STOP" request).  In any event, even if

his guesswork of were accurate, it merely shows the need for individualized inquiries on the interpretation of consent.

The review of the individual circumstances surrounding each "opt-out" that Biggerstaff unilaterally determined to be revocation of consent is impermissibly unwieldy. Biggerstaff explained he offered no legal opinions. Ex. H, p. 20-21, 48, and 56-57. Plaintiff's renewed motion is silent as to anything but the bald conclusion that Biggerstaff's report sufficiently identifies persons who revoked consent. To the extent that remains plaintiff's position, under the FCC interpretation above that revocation must be express, certification would require individualized inquiries as to the content of the text communications between the class and RingClear, as well as the surrounding circumstances.

Under these circumstances, this Court should deny certification based upon the predominance of individual inquiries. *See, e.g., Wolfkiel v. Intersections Ins. Servs. Inc.*, 303 F.R.D. 287, 293–94 (N.D. Ill. 2014); *Jamison v. First Credit Servs., Inc.*, 290 F.R.D. 92, 106 (N.D. Ill. 2013) (collecting cases). The court in *Jamison* described the defendant's predominance argument as follows: "if Honda needed to determine whether a person had provided consent to be called on his or her cellphone, Honda would have to undertake a labor intensive review of CASS's notes field, the audit logs as well as running the search through the 'phone' fields." 290 F.R.D. at 107. The court denied certification, holding:

> Based on this the Court would have to conduct a series of mini-trials to determine the population of the class and to determine liability. Specifically, the parties would need to scour Honda's records to determine whether a potential class member's wireless number appears in the CASS cellphone field, whether it appears in the notes field or whether it appears in the audit logs. Jamison's alternative class definition does not relieve this problem. While it would eliminate the 1,200 numbers identified in the CASS cellphone field, it would still require a determination of whether each putative class member's cellphone number appears anywhere in Honda's records. Since there is no way to employ generalized proof to prove consent, or lack thereof, Jamison has failed to meet his burden under Rule 23(b)(3) because individual issues predominate over common ones.

*Id.*

Another individualized inquiry arises concerning the identification of these persons. "To be ascertainable, a class must be identifiable as a class and membership within it must be determined by application of precise, objective criteria." *Bridgeview Health Ctr., Ltd.*, 2011 WL 4628744, at *2. *See also Pawelczak v. Financial Recovery Services*, 286 F.R.D. 381, 385 (N.D. Ill. 2012).

While plaintiff asserts that the text class is readily identifiable from CPA's records, there are an astonishingly large number of instances in which the person responding indicates there is a wrong number being texted. Biggerstaff's report reveals hundreds of instances where people indicate that the number belongs to someone else. These responses are obviously only a small portion of wrong numbers in the class, as they represent only those instances in which the person affirmatively offered the information. It is reasonable to infer that the number is far higher than even Biggerstaff's report shows.

Plaintiff has presented no way that the recipients of these texts could be identified by CPA's records. CPA's records will instead relate to persons other than those who now own the number associated with the cell. It would require an individualized inquiry into the identity of each recipient, which prohibits class certification here. *See, e.g., Jamison*, 290 F.R.D. at 107 ("As a result Jamison's solutions are insufficient to identify the regular user of a particular wireless number at the specific point in time FCS placed calls that were violative of the TCPA.").

## CONCLUSION

There is far too much at risk to be so fast and loose with class certification. Not every case is appropriate for class treatment. This one clearly is not. The facts of plaintiff's case are too unique, and the legal theories too factually focused. The plaintiff failed to give sufficient evidence to allow this Court to do the rigorous review required of class certification. As this response demonstrates, once this Court reviews the evidence submitted, the case should proceed on an individually basis.

WHEREFORE, Defendants, Credit Protection Association, L.P. and Etan General, Inc., respectfully request this Court enter an order denying the motion for class certification, and for any other relief this Court deems fair and just.

Respectfully submitted,

Credit Protection Association, L.P.
and Etan General, Inc.

By:    /s/Justin M. Penn
One of their attorneys
Justin M. Penn
HINSHAW & CULBERTSON LLP
222 North LaSalle Street, Suite 300
Chicago, Illinois 60601

## CERTIFICATE OF SERVICE

I hereby certify that on December 16, 2016 I electronically filed **RESPONSE IN OPPOSITION TO PLAINTIFF'S CORRECTED SECOND AMENDED MOTION FOR CLASS CERTIFICATION** with the Clerk of the Court using the CM/ECF system which will send notification of such filing(s) to the following:

**David J. Philipps**
Mary E. Philipps
Angie K. Robertson
PHILIPPS & PHILIPPS LTD
9760 South Roberts Road
Suite One
Palos Hills, IL 60465

**Steven James Halbert**
11805 N. Pennsylvania Street
AmeriCenters Building
Carmel, IN 46032

**Keith J. Keogh**
Timothy J. Sostrin
Keogh Law, Ltd.
55 W. Monroe Street
Suite 3390
Chicago, IL 60603

/s/Justin M. Penn
Justin M. Penn
jpenn@hinshawlaw.com
HINSHAW & CULBERTSON LLP
222 N. LaSalle Street
Suite 300
Chicago, IL 60601-1081
312-704-3000
312-704-3001 fax