UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| KATHERINE LANTERI, individually and on behalf of all others similarly situated, | ) ) ) | |
| *Plaintiff*, | ) ) | |
| *vs.* | ) ) | No. 1:13-cv-01501-JMS-MJD |
| CREDIT PROTECTION ASSOCIATION, L.P., a Texas Limited Partnership, and ETAN GENERAL, INC., a Texas Corporation, | ) ) ) ) | |
| *Defendants*. | ) | |

## **ORDER**

Plaintiff Katherine Lanteri filed a Complaint, individually and on behalf of others similarly situated (the "Class"), against Credit Protection Association, L.P. ("CPA") and Etan General, Inc. ("Etan") (collectively, "Defendants"), alleging that Defendants violated the Telephone Consumer Protection Act ("TCPA") and the Fair Debt Collection Practices Act ("FDCPA").  [Filing No. 1 at 1.]  Eventually, Defendants filed a Motion for Summary Judgment, [Filing No. 234], and Ms. Lanteri and the Class filed a Cross-Motion for Summary Judgment, [Filing No. 237].  After those motions were fully briefed, and upon a joint motion by the parties, the Court stayed and administratively closed this case pending the Seventh Circuit's decision in *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 460 (7th Cir. 2020).  [Filing No. 257; Filing No. 258.]

After *Gadelhak* was decided and this matter reopened, the Court directed the parties to confer and submit proposals as to how this case should proceed.  [Filing No. 259; Filing No. 261.] In response, the parties filed a Joint Report, [Filing No. 262], and Defendants separately filed a supplement to that report, [Filing No. 263], outlining their differing proposals but both asking the Court to permit them to withdraw their pending summary judgment motions and refile them,

1

[Filing No. 262 at 2; Filing No. 262 at 12].  For the reasons detailed below, the Court declines this request, **REINSTATES** the Motion and Cross-Motion for Summary Judgment that were pending before the case was stayed, [Filing No. 234; Filing No. 237], **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion for Summary Judgment, [Filing No. 234], and **GRANTS IN PART** and **DENIES IN PART** Ms. Lanteri's and the Class's Cross-Motion for Summary Judgment, [Filing No. 237].

# I.
## BACKGROUND AND PROCEDURAL HISTORY

On September 18, 2013, Ms. Lanteri filed a Complaint, individually and on behalf of others similarly situated, against CPA and Etan.  [Filing No. 1.]  Specifically, she asserted that Defendants violated the TCPA by making unsolicited phone calls and sending unsolicited text messages to cellular phones using prerecorded voices or an automatic telephone dialing system ("ATDS"). [Filing No. 1 at 8-9.]  She also asserted that Defendants violated the FDCPA by making phone calls and sending text messages in an attempt to collect a debt after the person receiving the communications had filed bankruptcy.  [Filing No. 1 at 9-10.]

Ms. Lanteri filed various motions seeking to certify a class for both the TCPA and FDCPA claims, several of which were unsuccessful.  [Filing No. 6; Filing No. 95; Filing No. 102; Filing No. 138; Filing No. 169.]  Following Ms. Lanteri's Third Amended Motion to Certify Class, [Filing No. 169], the Court denied class certification as to the FDCPA claim and certified a class as to the TCPA claim, [Filing No. 193; Filing No. 201].  The TCPA class was defined as follows:

(1) All persons within the United States (2) to whose cellular telephone number (3) [CPA] sent a text message (4) using its vendor RingClear (5) within four years of September 8, 2013, (6) after the cellular phone owner replied with the one-word reply "stop" in any combination of uppercase and lowercase letters other than "STOP" in all uppercase letters.

[Filing No. 201.]  This definition of the Class was used in the notice sent to all members.  [Filing No. 225 (approving Class Notice docketed at Filing No. 212-1).]

As required by the Case Management Plan and this Court's Scheduling Order dated February 7, 2019, [Filing No. 200 at 1; Filing No. 219], Ms. Lanteri filed her Statement of Claims on May 15, 2019, [Filing No. 231].  In that filing, Ms. Lanteri cited the TCPA's prohibition on making calls and sending text messages using a prerecorded voice or an ATDS.  [Filing No. 231 at 1.]  As to the TCPA claim on behalf of the Class, she stated that: (1) Defendants made 6,557 text message calls to her and the 4,362 class members using an ATDS, even after being told to stop; (2) the telephone system Defendants used to send the text messages is an ATDS; and (3) Defendants lacked consent to send the text messages.  [Filing No. 231 at 2.]  Ms. Lanteri also asserted an individual claim under the TCPA, stating that Defendants made voice calls to her cellphone using prerecorded voice messages and an ATDS on multiple occasions, after she had filed bankruptcy and sent a text message telling Defendants to stop.  [Filing No. 231 at 2-3.]  Regarding her individual FDCPA claim, Ms. Lanteri asserted that Defendants violated the statute by continuing to call and text her attempting to collect a debt after they had already received notice of her bankruptcy.  [Filing No. 231 at 2-4.]

On June 12, 2019, Defendants filed their Motion for Summary Judgment.  [Filing No. 234.]  In response, Ms. Lanteri and the Class filed a Cross-Motion for Summary Judgment on July 12, 2019.  [Filing No. 237.]  Both motions were fully briefed and were pending when, on November 12, 2019, the parties filed their Joint Motion to Stay Case Pending Ruling from Seventh Circuit on Potentially Dispositive Issue.  [Filing No. 257.]  In that motion, the parties asserted that: (1) "[t]he TCPA class claims require a determination whether the texts at issue were sent using an [ATDS]"; (2) the parties, in their respective summary judgment motions, presented lengthy arguments

concerning their competing definitions of what constitutes an ATDS; and (3) the *Gadelhak* decision would "almost certainly resolve the issue." [Filing No. 257 at 1-2.] The Court granted the motion and administratively closed the case. [Filing No. 258.]

The Seventh Circuit issued its decision in *Gadelhak* on February 19, 2020 and denied a petition for rehearing *en banc* on March 19, 2020. This Court then directed the parties to confer and file a notice suggesting a schedule for further action in this case. [Filing No. 261.] On April 3, 2020, the parties jointly filed their Second Report on Suggestions for Proceeding. [Filing No. 262.] On April 10, 2020, Defendants filed their Supplement to Second Report on Proceeding. [Filing No. 263.] The Court will first address the issues raised in these reports to determine the most appropriate and efficient way to proceed in this matter.

## II.
### PARTIES' PROPOSALS FOR PROCEEDING

The Class proposes that—in light of *Gadelhak*'s holding that "list-based dialing systems do not qualify as an ATDS"—the Court should permit the parties to withdraw their pending summary judgment motions "and file new cross motions based on the alternative theory of TCPA liability Plaintiff alleged." [Filing No. 262 at 1-2.] Specifically, the Class asserts that it should be able to proceed on the theory that Defendants violated the TCPA by making prerecorded voice calls to their cellphones without consent, as that claim does not require proof that Defendants used an ATDS. [Filing No. 262 at 2.] The Class argues that it does not matter that the class was certified to include people who received text messages after return-texting the word "stop," because text messages are treated as calls under the TCPA and because "there is evidence in the record [showing] the Class received prerecorded messages because[] . . . Plaintiff (who is a class member) got those messages." [Filing No. 262 at 4-5.] If the Class is able to prove liability at summary judgment, it argues, damages can be determined later through a "simple administrative process"

of counting the number of calls made after the request to stop.  [Filing No. 262 at 2-4.]  The Class asserts that it is not seeking a do-over or attempting to change the Class composition, but is instead attempting "to simply address an alternative theory of liability pled in the complaint that arises from the evidence." [Filing No. 262 at 5.]

Defendants vigorously oppose the Class's proposal, arguing that it is unfair and "not how class actions work." [Filing No. 262 at 6.]  Defendants emphasize that this case has been pending for six and a half years and has been "laser focused on the text class." [Filing No. 262 at 6.]  Defendants argue that the Class "will obviously lose in light of *Gadelhak*" and cannot proceed on a different theory than the one certified because the Court cannot assume that the same set of people who received the text messages at issue also received calls using prerecorded voice messages.  [Filing No. 262 at 8.]  Defendants assert that there is no evidence in the record establishing that the Class received phone calls, or that the "stop" text messages sent by Class members revoked their consent to receive phone calls, and Defendants would be prejudiced if the Class were allowed to proceed on a phone call claim for which Defendants have not had an opportunity to develop an evidentiary record.  [Filing No. 262 at 8-9.]  Defendants contend that allowing the Class to proceed on a theory that has not been litigated, certified, or properly explored through discovery, and upon which Class members have not been noticed, would create an unfair and "bizarre" result.  [Filing No. 262 at 9-12.]  Defendants agree, however, that the prior summary judgment motions should be withdrawn, re-briefed, and re-filed.  [Filing No. 262 at 12.]

In their supplemental report, Defendants point out that the RingClear vendor that was used to send text messages and was the subject of the summary judgment briefing is not the same vendor that Defendants used to make phone calls.  [Filing No. 263 at 2.]  Defendants also reiterate that there is no evidence in the record to suggest that any Class member ever received prerecorded

voice calls, and the fact that Ms. Lanteri may have received such calls (which Defendants do not concede) says nothing about whether the rest of the Class members did. [Filing No. 263 at 2.] Defendants maintain that "[t]he theory of liability is what determines who is and is not in the class," and therefore the Class cannot change its theory of liability without a new inquiry into the propriety of certification for that purpose. [Filing No. 263 at 3-5.]

The Court agrees with Defendants. The Class's proposal ignores the fact that this case has already proceeded through a long and arduous class certification process, which required the parties and the Court to expend substantial resources. As Defendants correctly point out, the Court conducted a rigorous analysis to determine whether the proposed Class claim—and the specific theory of liability on which it was based—was appropriate for certification. Of particular relevance, the Court considered whether there were common questions of law or fact among the Class, whether Ms. Lanteri's claims were typical of the Class, and whether Ms. Lanteri could adequately represent the Class's interests. [*See* Filing No. 193 (analyzing the requirements of class certification under Fed. R. Civ. P. 23).] No such analysis was ever conducted concerning a proposed class of people who allegedly were called using prerecorded voice messages. The Class has not asked the Court to conduct that analysis now, and in any event, it is far too late to do so at this juncture. Notably, the Class asserts that prerecorded voice messages were mentioned in the Complaint and addressed in discovery but does not indicate why a claim based on those messages was not pursued at the class certification stage. Accordingly, there is nothing to indicate that the failure to pursue this known claim was anything other than a conscious, strategic decision. That decision continues to bind the Class, and the Court finds that the Class is not permitted to proceed on any alternative theory of liability other than the one for which the Class was certified.

The Court must next determine whether re-filing of the summary judgment motions is necessary. Both parties seem to believe that it is, but it is unclear why, given that they also seem to believe that the proper resolution of the TCPA text message claim—the only issue affected by the stay—is now obvious in light of *Gadelhak*. The Court concludes that the briefing already completed adequately addresses the issues in this case and provides the Court with sufficient information and guidance to render a decision. Accordingly, the Court **REINSTATES** Defendants' Motion for Summary Judgment, [Filing No. 234], Ms. Lanteri and the Class's Cross-Motion for Summary Judgment, [Filing No. 237], and the related briefing, and will decide those motions on the merits.

### III.
### SUMMARY JUDGMENT MOTIONS

#### A.  Legal Standard

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion

can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them." *Johnson*, 325 F.3d at 898. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

"The existence of cross-motions for summary judgment does not, however, imply that there are no genuine issues of material fact." *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Engineers*, 335 F.3d 643, 647 (7th Cir. 2003).  Specifically, "[p]arties have different burdens of proof with respect to particular facts; different legal theories will have an effect on which facts are material; and the process of taking the facts in light most favorable to the non-movant, first for one side and then for the other, may highlight the point that neither side has enough to prevail" on summary judgment.  *Id.* at 648.

### B.  The Class's TCPA Claim

#### 1.  *Statement of Facts*

The following factual background is set forth pursuant to the standards outlined above. The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. Am. Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

##### a.  The Parties

Ms. Lanteri owed a debt for cable television services she received, [Filing No. 237-4 at 35], and she is a "consumer" for the purposes of the TCPA and the FDCPA.  CPA, a debt collector, is a Texas limited partnership.  [Filing No. 21 at 2; Filing No. 237-1 at 68.]  Etan is a Delaware corporation and is the general partner of CPA.  [Filing No. 21 at 3; Filing No. 237-2 at 2.] RingClear is a company that was in the business of reselling the SoundBite Communications platform ("SoundBite"),[1] which had a dialer service that could contact phone numbers via voice

---

[1] In their filings, the parties sometimes refer to this system as the RingClear system rather than Soundbite.  [*See, e.g.*, Filing No. 262 at 1.]  Both names refer to the same system.

calls and text messages.  [Filing No. 237-6 at 25-27.]  CPA contracted with RingClear to use the SoundBite platform to send debt collection text messages to individuals including Ms. Lanteri and the Class members.  [Filing No. 237-6 at 25; Filing No. 237-3 at 20; Filing No. 237-4 at 24.]  CPA also called Ms. Lanteri on several occasions.[2]  [Filing No. 237-1 at 75-78.]

                b.  The SoundBite Platform

The SoundBite platform that CPA utilized could be used to dial debtors and, if a call connected with a debtor, the call could be transferred directly back to a CPA agent.  [Filing No. 237-6 at 25.]  The SoundBite platform could also be used to send text messages to debtors.  [Filing No. 237-6 at 26-27.]

The first step of using the SoundBite platform is creating a "script," which is a set of instructions to the SoundBite platform on topics such as what the content of the message should be, what day and time the message should be sent, and the rate of speed at which the messages would be sent.  [Filing No. 237-6 at 58-59.]  Users, like CPA, would decide what elements would be included in the script.  [Filing No. 237-6 at 68.]  The user could also select certain filters to be used, such as filters for duplicate, invalid, or suppressed phone numbers, and these filters would prevent those numbers from being called or texted.  [Filing No. 237-6 at 59-60.]  The user could create a list of telephone numbers to be dialed and then transfer that list to the SoundBite platform using a File Transfer Protocol ("FTP"), which is a tool where files can be securely transferred from computer to computer over the internet.  [Filing No. 237-6 at 157.]  The transfer from the FTP site to the SoundBite platform could either be done by an individual by dragging the list from the FTP site to the SoundBite platform (i.e., the user would "click on a folder and essentially drag and drop

---

[2] CPA called Ms. Lanteri on May 25, June 25, July 12, July 17, July 18, July 26, July 31, August 13, and August 14, 2013.  [Filing No. 237-1 at 143-152.]

it"), or the SoundBite system could automatically search for any lists on the FTP site and transfer them over to the SoundBite platform to start the campaign. [Filing No. 237-7 at 75-77.] Transferring the list of phone numbers into the SoundBite platform would automatically initiate the text message campaign. [Filing No. 237-6 at 163.] Once initiated, the text campaign could then run on its own until it was completed. [Filing No. 237-6 at 173.] The user could choose to have the phone numbers texted sequentially or in a random order. [Filing No. 237-6 at 170.] The user could also use a suppression list feature, where phone numbers would be added to a separate list and those numbers would not be texted in the future. [Filing No. 237-6 at 61.] During and after the campaign, the user could receive reports that included data the user wanted to see, such as the date and time the text messages were attempted, whether the phone number was a landline or a mobile device, and the "completion status" (meaning whether the text was successfully sent, failed to send, or was responded to by the consumer). [Filing No. 237-6 at 111.] The SoundBite platform can store over 100,000 telephone numbers to call as part of a campaign, and it can make as many at ten calls per second. [Filing No. 237-7 at 59-60.] The platform also has a "predictive dialer" function, where it can make calls at varying rates of speed to increase the likelihood that the called party will be connected to an available agent. [Filing No. 237-7 at 77-79 (describing how users could "[a]dd a dialer pass to run a campaign using an automatic dialer that automatically dials phone numbers and then bridges calls to agents.").]

c. <u>CPA's Use of the SoundBite System</u>

RingClear worked with CPA to determine what specifications CPA wanted for its text message campaign, including "what message [CPA] would like to have sent, as well as functionality, reporting, [and] data transfer." [Filing No. 237-6 at 31; Filing No. 237-3 at 21.] CPA created a list of consumers to whom it wanted to send text messages. [Filing No. 237-3 at

11

46.] CPA would "drop" the list into the FTP folder and the text campaign would start and would send the text messages on the date and time selected by CPA. [Filing No. 237-3 at 95.] Within the body of the text messages CPA sent out, there was language instructing the consumer that if he or she no longer wanted to receive text messages from CPA, he or she could text back the word "stop." [Filing No. 237-3 at 58.] When a consumer texted "stop," the completion status for that text message would read "TEXT_MSG_OPT_OUT" on the report CPA received. [Filing No. 237-3 at 58; Filing No. 237-6 at 107.] CPA received reports from the SoundBite system nightly. [Filing No. 237-3 at 61.] In addition to the reports, CPA could also log into the SoundBite platform to see what was happening in the text message campaign. [Filing No. 237-3 at 98.] Part of CPA's script was supposed to provide that when a consumer texted back "stop," the consumer's phone number would be added to the suppression list, which would prevent the SoundBite platform from texting that number again in the future. [Filing No. 237-6 at 99.]

> d. Text Messages Sent to Ms. Lanteri and the Class

On May 23, 2013, CPA sent a text message to Ms. Lanteri. [Filing No. 1 at 6; Filing No. 1-5 at 1.] Within one minute, Ms. Lanteri responded "stop." [Filing No. 237-1 at 153.] A screenshot of the text message exchange is below.



Despite having opted out of receiving further text messages from CPA, Ms. Lanteri received a second text message from CPA on June 24, 2013. [Filing No. 1 at 7; Filing No. 237-1 at 154.] That text message is displayed below.



After this lawsuit was filed, CPA contacted RingClear to figure out why these post-"stop" text messages were sent. [Filing No. 237-6 at 203-204.] A RingClear engineer investigated what could have caused the SoundBite platform to continue texting numbers that had replied "stop," and he determined that the suppression list had been disconnected from the campaign. [Filing No. 237-6 at 202-203.] A suppression list could be disconnected from a campaign by manually going into the SoundBite platform and checking a box. [Filing No. 237-6 at 205-206.] The only parties with the ability to disconnect a suppression list are those that have access to the account. [Filing No. 237-6 at 205-206.] Here, CPA (the user) and RingClear (the administrator) were the only parties that had access to the account. [Filing No. 237-6 at 205-206.]

    2.  *Discussion*

As an initial matter, the Court reminds the parties of their duties in summary judgment practice. Although it is the Court that "must view the record in the light most favorable to the non-moving party and give the benefit of reasonable inference to the non-moving party," counsel must keep in mind that "[m]isrepresenting the record or ignoring evidence favorable to the opponent to

claim a fact is undisputed can quickly undermine the persuasive force of a motion." *Chaib v. Geo Group, Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). Throughout their briefs, the parties ran afoul of this guidance and repeatedly omitted relevant facts favorable to the other party or misrepresented the record.

For example, in their opening brief, Defendants cite "CPA's agreement with RingClear," and assert that "CPA specifically contract[ed] with RingClear to immediately and automatically add any numbers that texted 'STOP' to a suppression list that no longer received text messages." [Filing No. 235 at 16.] However, as pointed out by Ms. Lanteri, the "contract" submitted by Defendants appears to be two pages from separate documents that were drafted three years apart. [Filing No. 238 at 11.] The first page of the "contract" submitted by Defendants is page 1 of a 2009 contract between CPA and RingClear, while the second page is part of a nine-page 2012 document titled "Terms of Service." [Filing No. 237-8; Filing No. 237-9.] The two-page "contract" on which Defendants rely in support of their motion appears to be a fabrication. Ms. Lanteri challenged the validity of the "contract" in her cross-motion and response brief, and Defendants did not respond to her challenge, thereby conceding that the "contract" was not what Defendants purported it to be. *Sojka v. Bovis Lend Lease, Inc.*, 686 F.3d 394, 395 (7th Cir. 2012) (noting that a party concedes a point by failing to respond to it in their response brief); *Curran v. Kwon*, 153 F.3d 481, 485-86 (7th Cir. 1998) (by failing to respond to defendant's statement of uncontested facts, plaintiff is deemed to have conceded the truth of those factual averments that are properly supported).

Moreover, the actual language in the documents does not state what Defendants allege it does. The 2009 contract does not say anything about opt-outs or suppression lists. The Terms of Use document does state that "RingClear shall enforce opt-out requests . . . by not sending

14

messages to [consumers] who have . . . requested opt-out," [Filing No. 237-9 at 6], but another part of the document puts the onus on the user (CPA) to "not use, or attempt to use, the Services to contact any person or entity by telephone or text message that has previously requested not to be called" and "maintain a list containing the names and phone numbers of such individuals or entities," [Filing No. 237-9 at 4]. This is just one example—but perhaps the most egregious example—of the parties' omissions and misrepresentations.

The Court cautions the parties that ignoring the standard of review and hoping the Court will do the same is not a proper litigation tactic, as it wastes the Court's and the parties' time and resources. *See Malin v. Hospira, Inc.*, 762 F.3d 552, 564 (7th Cir. 2014) (reprimanding a party for "bas[ing] its litigation strategy on the hope that neither the district court nor [the appellate court] would take the time to check the record," and stating that such "shenanigans" destroy credibility with the court and are "both costly and wasteful").

With that said, the Court now turns to the issues presented in the parties' motions. As to the Class' TCPA claim, the parties identified several issues, but the Court will only address the dispositive issue of whether the TCPA applies in this case following the Seventh Circuit's decision in *Gadelhak*.

In order to prove its TCPA claim, the Class must establish that:

> (1) Defendants made non-exempt "calls"
> (2) to the Class members' cellphones
> (3) without the Class members' prior express consent
> (4) using an ATDS.

*See* 47 U.S.C. § 227(b)(A)(1)(iii). The parties do not dispute that the post-"stop" text messages were sent to the Class members' cellphones without their consent. The parties also agree that text messages qualify as "calls" under the TCPA. The only issue in dispute is whether these text messages were sent using an ATDS.

The parties' respective arguments on the ATDS issue were primarily focused on how the Court should interpret the statutory definition of an ATDS.  The statute defines an ATDS as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). In *Gadelhak*, the Seventh Circuit held that the phrase "using a random or sequential number generator" modifies both "store" and "produce," which "mean[s] that a device must be capable of performing at least one of those functions using a random or sequential number generator to qualify as an [ATDS]." 950 F.3d at 460, 463.  Thus, equipment that "exclusively dials numbers stored in a customer database" is not an ATDS, and sending automated text messages with such equipment does not violate the TCPA.  *Id.* at 460.  "[T]he capacity to generate random or sequential numbers is necessary to the statutory definition." *Id.* at 469.

Here, Defendants advocated for the definition ultimately adopted by the Seventh Circuit in *Gadelhak*, [Filing No. 235 at 18-24], while the Class argued that the phrase "using a random or sequential number generator" applied only to a system's ability to "produce telephone numbers" but did not apply to a system's ability to "store" telephone numbers, and therefore, any system that stores numbers—such as SoundBite—is an ATDS, [Filing No. 238 at 14-29.]  The Class's proposed interpretation is one that was expressly considered and rejected in *Gadelhak*, 950 F.3d at 466-68, and its attempt to proceed with briefing on an entirely different theory of liability all but concedes that the SoundBite system does not meet the definition that *Gadelhak* adopted, [*see* Filing No. 262 at 1-2 ("Although it has long been the law that a system meets the test if it dials from a stored list, like the [SoundBite] system Defendants used here, and although the Class relied on that authority in seeking judgment against Defendants for the text calls they made to Plaintiff

and the Class, *Gadelhak* abandoned that long-standing rule and held list-based dialing systems do not qualify as an ATDS." (footnote omitted))].

Regardless of whether the point has been conceded, though, the Court concludes that summary judgment in favor of Defendants on the Class's TCPA claim[3] is appropriate because the evidence shows that the SoundBite system is not an ATDS under the definition that now controls. The evidence presented shows—and the Class's arguments in support of their claim acknowledge—that SoundBite sent text messages to specific phone numbers from stored customer lists. [*E.g.*, Filing No. 235-8 at 3 (CPA employee affidavit stating that "[o]nce someone at CPA determined on which accounts a text should be sent, CPA used RingClear's services to text only those numbers and accounts that had been specifically selected for campaigns by CPA's management team"); Filing No. 238 at 14 (Class arguing that "the undisputed facts show [SoundBite] . . . can dial telephone numbers from a stored list"); Filing No. 238 at 17 (Class explaining that CPA "uploaded the list of telephone numbers to be called into the system, which then stored the numbers throughout the campaign and automatically dialed them"). SoundBite is similar to the system at issue in *Gadelhak*, which was determined not to be an ATDS. The Class has pointed to no evidence demonstrating that SoundBite has the capacity to either store or produce telephone numbers using a random or sequential number generator,[4] and therefore, based on the undisputed evidence, the Court can conclude as a matter of law that the SoundBite system is not

---

[3] Neither Defendants nor Ms. Lanteri moved for summary judgment on Ms. Lanteri's individual TCPA claim.  Accordingly, while the portion of her claim that asserts a claim based on text messages fails along with the class claim, her claim related to prerecorded voice messages remains and is not addressed in this Order.

[4] Although the Class proceeded on the argument that ATDS should be defined differently and could not have known at the time of briefing which definition this Court (or the Seventh Circuit) would adopt, it did not offer any alternative argument as to why the SoundBite system would constitute an ATDS under the Defendants' proposed definition.  And still, in the joint status report, the Class does not assert that it has any evidence showing that the system is an ATDS.

an ATDS.  The Class's TCPA claim fails as a matter of law, and Defendants' Motion for Summary Judgment is **GRANTED** as to this claim.  The Class's Cross-Motion for Summary Judgment on this claim is **DENIED**.

### C.  Ms. Lanteri's Individual FDCPA Claims

1.  *Statement of Facts*[5]

On April 29, 2013, Ms. Lanteri filed for bankruptcy, listing the name and email address of the attorney who was representing her and designating CPA as a creditor/debt collector.  [Filing No. 1 at 6; Filing No. 237-10 at 3.]  CPA received notice of the bankruptcy in early May 2013.  [Filing No. 237-1 at 88.]

CPA had a process in place for updating its records when consumers/debtors filed for bankruptcy.  Specifically, CPA would log into the bankruptcy notification center file server each day to see what bankruptcy notifications had been received from the bankruptcy court.  [Filing No. 237-1 at 19.]  CPA's system was supposed to use this information to add a "BNK status" on each individual debtor's CPA records so that CPA would no longer send letters or make phone calls to that person.  [Filing No. 237-1 at 24.]  When CPA received a bankruptcy notification, CPA used a program that had "logic in place that [was supposed to] match up the information in the file with accounts on [CPA's] system."  [Filing No. 237-1 at 20.]  The program was to first search for a match using the individual's social security number.  [Filing No. 237-1 at 21.]  If no match was found based on the full social security number, then the program was to search using the last five digits of the social security number.  [Filing No. 237-1 at 21.]  Then, if no match was found at that point, the program was to perform a search by the individual's last name.  [Filing No. 237-1 at 21.]

---

[5] The factual background in this Section is set forth pursuant to the same standards as the facts contained in Section III(B)(1) above.

If the program did not find a match in CPA's records, then a "reject report" was to be generated and sent to CPA's data entry team, who was to manually input the information into CPA's system. [Filing No. 237-1 at 22.] In addition to retrieving the bankruptcy notifications from the court's file server, CPA also monitored information from LexisNexis on consumers for whom CPA has collections records. [Filing No. 235-3.] CPA compared the information from LexisNexis to each new account CPA received for collection. [Filing No. 235-3.]

When CPA received notice of Ms. Lanteri's bankruptcy in early May 2013, it used its program that had "logic in place that [was to] match up the information in the file with accounts on [CPA's] system." [Filing No. 237-1 at 20.] However, the program "did not process [the notice] correctly," despite Ms. Lanteri's full social security number being on the notice. [Filing No. 237-1 at 88; Filing No. 237-1 at 21.] The notice was placed on "a reject report, which was supposed to be manually worked," meaning that the information was supposed to be manually input into CPA's system by its data entry team, but for some reason, the reject report "was not worked." [Filing No. 237-1 at 88.] Accordingly, despite having received notice of the bankruptcy, CPA sent the text message pictured above to Ms. Lanteri on May 23, 2013, to which she replied "stop." [Filing No. 1 at 6; Filing No. 1-5 at 1; Filing No. 237-1 at 153.] Thereafter, CPA called Ms. Lanteri on May 25, June 25, July 12, July 17, July 18, July 26, July 31, August 13, and August 14, 2013. [Filing No. 237-1 at 143-152.] CPA also sent Ms. Lanteri a test message on June 24, 2013. [Filing No. 1 at 7; Filing No. 237-1 at 154.] The purpose of these text messages and phone calls was to collect a debt. [Filing No. 237-1 at 68; Filing No. 237-4 at 35.]

When CPA received a second notification of Ms. Lanteri's bankruptcy in August 2013, CPA "shut the account down." [Filing No. 237-1 at 88.] CPA does not know why Ms. Lanteri's first bankruptcy notice was not matched up with her account in CPA's records because CPA was

provided with Ms. Lanteri's full social security number.  [Filing No. 237-1 at 21.]  CPA does not know what error caused its program to fail to match up Ms. Lanteri's bankruptcy notification with her records in the CPA system, and it can only say that it was "an anomaly in the program."  [Filing No. 237-1 at 21-22.]  CPA does not know which data entry employee was supposed to manually enter Ms. Lanteri's notice of bankruptcy into CPA's records because the original reject report that would have the employee's initials on it was not preserved.  [Filing No. 237-1 at 28-29.]  CPA does not know why the entry of Ms. Lanteri's bankruptcy notice was not made, or in other words, why it "got skipped."  [Filing No. 237-1 at 100.]  After this action was filed, CPA pulled a copy of the reject report and said, "it looks like the data entry person that had worked that report had skipped over, somehow, Ms. Lanteri's entry."  [Filing No. 237-1 at 25.]  CPA asserts that this was "a human error."  [Filing No. 237-1 at 100.]  CPA indicated that its data entry supervisor would "do audits from time to time of what is being keyed."  [Filing No. 237-1 at 100-101.]

         2.  *Discussion*

         Ms. Lanteri argues that that the texts and phone calls she received after CPA was notified of her bankruptcy and after she texted "stop" violate multiple sections of the FDCPA: 15 U.S.C. §§ 1692c, 1692c(a)(2), 1692e, and 1692e(2).  The Court will first address two preliminary issues that apply to all sections: (1) whether Etan can be held liable for CPA's alleged violations; and (2) whether the bona fide error defense applies to preclude Defendants' liability.  The Court will then address liability under each section.[6]  Because the parties have filed cross-motions for summary judgment on several of the issues involved in this case, the Court addresses the parties as cross-movants in some sections of this Order and treats the parties as movant and non-movant

---

[6] Although Ms. Lanteri need only establish that any given communication violated a single section of the FDCPA in order to prevail on an FDCPA claim concerning that communication, the Court addresses all four FDCPA sections asserted as alternative bases for liability.

in other sections.  *See R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Engineers, 335 F.3d 643, 648 (7th Cir. 2003)* (noting courts considering cross-motions for summary judgment must "tak[e] the facts in the light most favorable to the non-movant, first for one side and then for the other. . . .").

a.  <u>Can Etan be held Liable for CPA's alleged violations of the FDCPA?</u>

Defendants argue that Etan should not be held liable under the FDCPA because: (1) Etan is just a 1% general partner of CPA; (2) Etan did not send the text message(s); (3) the text message(s) were not sent on Etan's behalf; and, (4) Etan had no involvement in CPA's debt collection process.  [Filing No. 235 at 32.]  Therefore, Defendants argue, if the Court finds that CPA violated the FDCPA, Etan should not also be held liable.

In response, Ms. Lanteri argues that Etan is liable to the same extent as CPA because it is CPA's general partner and, under Texas law, "the general partner of a limited partnership is liable for all actions of the partnership."  [Filing No. 238 at 38.]  Ms. Lanteri argues that it is immaterial whether Etan was involved in CPA's debt collection process because "all partners are jointly and severally liable for all obligations of the partnership."  [Filing No. 238 at 38 (quoting TEX. BUS. ORG. CODE ANN. § 152.304 West 2011).]  Ms. Lanteri also argues that "CPA's claim that Etan is just a '1%' general partner is unsupported."  [Filing No. 238 at 38.]

In reply, Defendants reiterate their argument that it is undisputed that Etan was not involved in the debt collection process and did not send any text messages or make any phone calls.  [Filing No. 242 at 36.]  Defendants argue that Ms. Lanteri has not cited any cases that would impute liability on an entity that was not involved in the alleged violations.  [Filing No. 242 at 36.]

21

Ms. Lanteri refutes Defendants' argument that Etan did not make any phone calls or send any text messages, because "Etan is part of CPA (and thus it acts when CPA acts)." [Filing No. 243 at 21.]

"[P]artners, unlike corporations, do not enjoy limited liability." *Miller v. McCalla, Raymer, Padrick, Cobb, Nichols, and Clark, L.L.C.*, 214 F.3d 872, 876 (7th Cir. 2000). In *Miller*, the Seventh Circuit held that the debt collector's liability for a violation of the FDCPA could be imputed to the partners of the debt collector, and "the plaintiff was entitled to sue the partners as well as the partnership." *Id.*

It is undisputed that Etan is the general partner of CPA, a Texas limited partnership. Therefore, CPA's liability under the FDCPA is imputed to Etan. *See* Tex. Bus. Orgs Code § 152.304 ("all partners are jointly and severally liable for all obligations of the partnership. . . ."); *see also Miller*, 214 F.3d at 876. Accordingly, Defendants' Motion for Summary Judgment on the issue of Etan's liability is **DENIED**, and Ms. Lanteri's Cross-Motion for Summary Judgment on this issue is **GRANTED**. The Court finds that Etan can be held jointly and severally liable for any violations of the FDCPA committed by CPA.

      b.  <ins>Does the Bona Fide Error Defense Preclude Defendants' Liability?</ins>

15 U.S.C. § 1692k(c) provides that "[a] debt collector may not be held liable in any action brought under [the FDCPA] if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." This bona fide error defense applies to every subsection of the FDCPA. The Court will first address the issue of whether Defendants are entitled to the bona fide error defense as a matter of law because, if the Defendants are entitled

to the defense, Ms. Lanteri cannot prevail on her FDCPA claims.  Then the Court will address whether Ms. Lanteri is entitled to summary judgment on the bona fide error defense.

Defendants argue that CPA is entitled to the bona fide error defense as to Ms. Lanteri's claims because, although it did contact Ms. Lanteri after she filed for bankruptcy, this was an unintentional error and CPA has procedures in place to avoid this type of error.  [Filing No. 235 at 27.]  Defendants argue that CPA did not intend to communicate with Ms. Lanteri when she was represented by an attorney or regarding an account that was included in her bankruptcy.  [Filing No. 235 at 28.]  Defendants argue this error was made in good faith and it occurred because CPA did not properly process the bankruptcy notification.  [Filing No. 235 at 28.]  Defendants argue that: (1) CPA has a policy to not collect on accounts included in a bankruptcy; (2) its procedures are reasonably adapted to avoid this problem; and, (3) the law does not require that the procedures be fail-safe.  [Filing No. 235 at 29-30.]

Ms. Lanteri argues that Defendants cannot establish the bona fide error defense as a matter of law because they do not identify any "error."  Instead, Ms. Lanteri argues, Defendants just claim that CPA "'did not properly process notification of the bankruptcy proceeding until August of 2013.'"  [Filing No. 238 at 42-43 (quoting Filing No. 235 at 28).]  Ms. Lanteri also argues that CPA cannot prove that it had a procedure in place that was "reasonably adapted" to avoid the alleged error.  [Filing No. 238 at 44.]  Ms. Lanteri argues that CPA knows that the system it uses to automatically add bankruptcy notifications to its database is unreliable because CPA had a data entry group in place that was dedicated to manually inputting the bankruptcy notifications when the system failed to work.  [Filing No. 238 at 44.]  And, Ms. Lanteri points out, this "backup" also failed because the bankruptcy notice was not keyed into the program, for whatever reason, and CPA continued to contact Ms. Lanteri.  [Filing No. 238 at 44.]  Ms. Lanteri argues that although

CPA's procedures do not have to be foolproof, they should not allow the same "error" to occur over and over.  [Filing No. 238 at 45.]  Finally, Ms. Lanteri argues that CPA's alleged policy of not contacting consumers that it knows are represented by counsel or have filed for bankruptcy is not a "procedure" that can provide a basis for the bona fide error defense because it does not describe "'regular orderly' steps to follow."  [Filing No. 238 at 45-46 (citing *Leeb v. Nationwide Credit Corp.*, 806 F.3d 895, 900 (7th Cir. 2015)).]

In response, Defendants argue that they did identify an error—specifically, "CPA's system not processing the bankruptcy notice correctly."  [Filing No. 242 at 33.]  Defendants argue that "[t]he mere fact that the collection continued, contrary to the policy, is the error."  [Filing No. 242 at 33.]  Defendants argue that Ms. Lanteri has not cited any authority that would require Defendants to explain the exact reasons why the error occurred.  [Filing No. 242 at 34.]

In reply, Ms. Lanteri reiterates that CPA cannot claim that the communications occurred because of an error if CPA cannot even explain what the error was—i.e. *why* CPA failed to process the notice.  [Filing No. 243 at 20.]  Ms. Lanteri also argues that Defendants indicated that auditing of the data entry team only occurs "from time to time," which guarantees that the entry of some bankruptcy notifications will be missed, like what appears to have happened here.  [Filing No. 243 at 20 (citing Filing No. 238 at 44).]  Additionally, Ms. Lanteri argues, Defendants have presented no competent evidence showing that the alleged audits actually occurred.  [Filing No. 243 at 20.]

 "A defendant is entitled to invoke the FDCPA's bona fide error defense only if it can show that the violation: (1) was unintentional, (2) resulted from a bona fide error, and (3) occurred despite the debt collector's maintenance of procedures reasonably adapted to avoid such error." *Ruth v. Triumph P'ships*, 577 F.3d 790, 803 (7th Cir. 2009).  As for the unintentionality prong, a debt collector "need only show that its FDCPA violation was unintentional, not that its actions

were unintentional." *Kort v. Diversified Collection Servs., Inc.*, 394 F.3d 530, 537 (7th Cir. 2005). "Regarding the second prong, a 'bona fide error' is an 'error made in good faith; a genuine mistake, as opposed to a contrived mistake.'" *Barnes v. Nw. Repossession, LLC*, 210 F. Supp. 3d 954, 966 (N.D. Ill. 2016) (quoting *Kort*, 394 F.3d at 537). "The purpose of the second prong is to evaluate whether the debt collector's actions were objectively reasonable, and thus merit excuse from liability under the FDCPA." *Cerrato v. Solomon & Solomon*, 909 F. Supp. 2d 139, 147-48 (D. Conn. 2012) (citation omitted) (finding that "it is a question of fact for the jury as to whether it was reasonable for [debt collector's employee] to place the . . . hold on only one account even though the letter referenced 'all accounts.'"). Finally, regarding the third prong, courts in the Seventh Circuit have explained that the "mere assertion of good intent, absent a factual showing of actual safeguards reasonably adopted to avoid violations of the FDCPA, is insufficient to sustain the [bona fide error] defense." *Jenkins v. Union Corp.*, 999 F. Supp. 1120, 1141 (N.D. Ill. 1998) (internal quotations omitted); *Turner v. J.V.D.B. & Assocs., Inc.*, 318 F. Supp. 2d 681, 683, 687 (N.D. Ill. 2004) (holding that defendant "ceasing collection activities on accounts once it learns from a consumer (debtor) that the debtor has filed for bankruptcy does not qualify as a reasonable procedure[,] . . . [because it] merely constitute[s] after-the-fact conduct on the part of [defendant] and cannot be considered as the maintenance of preventative procedures reasonably designed to prevent an error or violation of the FDCPA in the first instance").

In *Slick v. Portfolio Recovery Assocs., LLC*, 111 F. Supp. 3d 900, 908 (N.D. Ill. 2015), a debt collector attempted to use the bona fide error defense, and the debt collector's "argument [was] devoted almost entirely to the third element of the defense." The *Slick* court stated that the debt collector "essentially collapse[d] the three elements of the bona fide error defense into one: *i.e.*, because it provides training and guidelines to its collectors, any deviation from that guidance must

be unintentional and undertaken in good faith." *Id.* However, as the court noted, the debt collector did not set forth any testimony from any of its employees who may have had firsthand knowledge of how the debt collector handled plaintiff's account. *Id.* The court held that the debt collector was not entitled to the bona fide error defense because "[i]t would be pure speculation to conclude that [debt collector's] employee (or employees): (1) did not intentionally violate § 1692g; and (2) made a good-faith mistake. Speculation is not enough to survive summary judgment." *Id.*

A similar result was reached in *Litt v. Portfolio Recovery Assocs. LLC*, 146 F. Supp. 3d 857, 876 (E.D. Mich. 2015), where the court found that the debt collector offered evidence regarding training and procedures it used, but failed to offer anything beyond speculation in support of the first and second prongs of the bona fide error defense. The court denied the debt collector's motion for summary judgment, stating "[e]ven viewing the facts in the light most favorable to PRA, there is no evidence from which the Court could divine the intention of the individual PRA callers (who have never been identified) who continued to call [plaintiffs] after PRA learned" that the plaintiffs' phone number was a wrong number. *Id.* The court noted that because the debt collector failed to identify who the actual callers were, it would be impossible for the debt collector to establish that its "error" was unintentional. *Id.*

A third case that is analogous to this action is *Buckley v. Anfi, Inc.*, 133 F. Supp. 3d 1140, 1153 (S.D. Ind. 2016), in which the debt collector similarly sought the use of the bona fide error defense, but the court found that the debt collector failed to present any evidence on the defense's first and second prongs. The court explained that the debt collector "offer[ed] no explanation or evidence of what precise error occurred in this case, which is essential in order to successfully argue the third prong. Without identifying the precise error, [the debt collector] cannot adequately explain how the policies and procedures it had in place were designed to address that error." *Id.*

The court held that the debt collector was not entitled to the bona fide error defense and, therefore, the debt collector had violated the FDCPA and plaintiff was entitled to summary judgment. *Id.*

Here, Defendants, like the debt collectors in the cases described above, have failed to introduce sufficient evidence to satisfy all three prongs of the bona fide error defense and, therefore, they are not entitled to summary judgment on this issue as a matter of law. *See Buckley,* 133 F. Supp. 3d at 1153 (defendant "must show all three elements to succeed on the bona fide error defense"). As Ms. Lanteri has noted, Defendants are unable to even identify exactly what "error" occurred. The only explanations that Defendants have given are that the program "did not process [the notice] correctly," [Filing No. 237-1 at 88], that there was "an anomaly in the program," [Filing No. 237-1 at 21-22], that for some reason the reject report "was not worked," [Filing No. 237-1 at 88], that "it looks like the data entry person that had worked that report had skipped over, somehow, Ms. Lanteri's entry," [Filing No. 237-1 at 25], and that it was "a human error." [Filing No. 237-1 at 100]. But none of these assertions explain exactly what error occurred and how it occurred.

Moreover, Defendants cannot even identify the person or persons that were supposed to manually input Ms. Lanteri's bankruptcy notice. This leaves the Court with nothing but speculation on all three prongs of the bona fide error defense, which is plainly insufficient on summary judgment. *See Slick,* 111 F. Supp. 3d at 908; *Litt,* 146 F. Supp. 3d at 876; *Buckley,* 133 F. Supp. 3d at 1153 ("[Debt collector] fails to identify exactly what went wrong with [plaintiff's] DIRECTV account and it fails to identify how its policies were aimed at preventing this error from happening."); *see also Stratton v. Portfolio Recovery Assocs., LLC,* 171 F. Supp. 3d 585, 604 (E.D. Ky. 2016), *aff'd,* 706 F. App'x 840 (6th Cir. 2017) (finding that debt collector's proof of bona fide error prong was "too speculative" where "defendant [did] not provide evidence concerning how

[plaintiff's] account was handled.  Instead, [debt collector] merely argues that whatever factual or legal mistake occurred must have resulted from a misunderstanding of law.").  Accordingly, Defendants have failed to meet their burden, and the Court holds that they have not shown, as a matter of law, that they are entitled to the bona fide error defense.  Defendants' Motion for Summary Judgment on this issue is **DENIED**.

Ms. Lanteri cross-moved for summary judgment on this issue, asking the Court to find that, as a matter of law, Defendants are not entitled to the bona fide error defense.  Defendants had the opportunity to present any evidence demonstrating there was, at least, a genuine issue of material fact related to this issue.  However, as explained above, Defendants failed to provide any evidence showing what the actual error was and, as such, Defendants could not show that it has procedures in place to prevent the occurrence of such an error.  As the Seventh Circuit Court of Appeals has explained, summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Schact v. Wis. Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999).  In response to Ms. Lanteri's Cross-Motion for Summary Judgment, Defendants offered no additional evidence from which it could be inferred that the violations of the FDCPA: (1) were unintentional; (2) resulted from a bona fide error; and, (3) occurred despite Defendants' "maintenance of procedures reasonably adapted to avoid such error." *Ruth v. Triumph P'ships*, 577 F.3d 790, 803 (7th Cir. 2009).  Therefore, Ms. Lanteri's Cross-Motion for Summary Judgment on this issue is **GRANTED**; Defendants are not entitled to the bona fide error defense on Ms. Lanteri's FDCPA claims.

### c.   Liability Under the FDCPA

The Court now turns to the substantive analysis of Ms. Lanteri's claims.  Ms. Lanteri is seeking judgment in her favor as to liability on her claims based on the following sections of the

FDCPA: §1692c(a)(2), § 1692c(c), § 1692e, and§ 1692e(2).   [Filing No. 238 at 47.]   The Court addresses each in turn.

### i.   § 1692c(a)(2)

Section § 1692c(a)(2) of the FDCPA provides:

> Without the prior consent of the consumer given directly to the debt collector or the express permission of a court of competent jurisdiction, a debt collector may not communicate with a consumer in connection with any debt . . . if the debt collector knows the consumer is represented by an attorney with respect to such debt and has knowledge of, or can readily ascertain, such attorney's name and address, unless the attorney fails to respond within a reasonable period of time to a communication from the debt collector or unless the attorney consents to direct communication with the consumer.

15 U.S.C. § 1692c(a)(2).

It is undisputed that: (1) CPA received Ms. Lanteri's bankruptcy notice in early May 2013; (2) CPA was listed as a creditor in the notice; (3) the notice included the contact information for Ms. Lanteri's attorney; and, (4) after receiving the bankruptcy notice, CPA communicated directly with Ms. Lanteri via text messages and telephone calls.   The Court has already determined that Defendants are not entitled to the bona fide error defense on this claim.   As such, there are no genuine issues of material fact related to this claim and Ms. Lanteri is entitled to judgment in her favor as a matter of law.   Ms. Lanteri's Cross-Motion for Summary Judgment on the issue of liability for her § 1692c(a)(2) claim is **GRANTED**.   Defendants' Motion for Summary Judgment on this claim is **DENIED**.

### ii.   §1692c(c)

Section 1692c(c) of the FDCPA provides: "If a consumer notifies a debt collector in writing that the consumer refuses to pay a debt or that the consumer wishes the debt collector to cease

further communication with the consumer, the debt collector shall not communicate further with the consumer with respect to such debt."  15 U.S.C. § 1692c(c).

The record demonstrates that: (1) Ms. Lanteri texted "stop" when CPA contacted her via text message; (2) despite receiving the "stop" text message indicating Ms. Lanteri wanted to "opt out," CPA sent her a second text message; and, (3) CPA made several phone calls to Ms. Lanteri after receiving her "stop" text message.  Ms. Lanteri indicated in writing that she wanted to "opt out" of communications from CPA, but CPA continued to contact her.  And, as explained above, Defendants are not entitled to the bona fide error defense.  Therefore, there are no genuine issues of material fact related to this claim and Ms. Lanteri is entitled to judgment in her favor as a matter of law.  Accordingly, Ms. Lanteri's Cross-Motion for Summary Judgment on the issue of liability for her § 1692c(c) claim is **GRANTED**.  Defendants' Motion for Summary Judgment on this claim is **DENIED**.

### iii.    § 1692e and § 1692e(2)

Ms. Lanteri seeks relief under § 1692e of the FDCPA, which provides: "A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt."  15 U.S.C. § 1692e.  The statute contains a non-exhaustive list of ways that debt collectors can violate this provision, *Lox v. CDA, Ltd.*, 689 F.3d 818, 822 (7th Cir. 2012), including § 1692e(2)(A), which prohibits "[t]he false representation of . . . the character, amount, or legal status of any debt."  15 U.S.C. § 1692e(2)(A).

Defendants argue that they cannot be found to have violated § 1692e because the undisputed evidence shows that Ms. Lanteri knew that her debt was discharged in her bankruptcy. [Filing No. 235 at 30.]  Defendants cite Ms. Lanteri's deposition testimony and argue that Ms. Lanteri was never under the impression that she owed the debt, and therefore, she could not have

been misled by CPA's alleged representation that CPA could collect on the debt.[7]  [Filing No. 235 at 30-31.]

In response, Ms. Lanteri argues that the undisputed evidence shows CPA misrepresented the status of the debt when it contacted her demanding payment of a debt that was not subject to collection due to her bankruptcy.  [Filing No. 238 at 40.]  Ms. Lanteri argues that the cited deposition testimony does not show that she thought the debt had been discharged; instead, it simply shows what her understanding is regarding what a bankruptcy discharge accomplishes. [Filing No. 238 at 42.]  Moreover, Ms. Lanteri argues, contrary to Defendants' argument, she could not have thought that the debt had been discharged at the time she received CPA's communications, because she had not yet received the discharge; the phone calls occurred between late May 2013 and August 14, 2013, but Ms. Lanteri did not receive the discharge until August 20, 2013.  [Filing No. 238 at 42 (citing Filing No. 237-10); Filing No. 237-1 at 75-78; Filing No. 237-1 at 143-152.] Ms. Lanteri argues that CPA's communications falsely implied that the debt was still subject to collection, and therefore CPA violated § 1692e(2).  [Filing No. 238 at 40.]

In reply, Defendants argue that Ms. Lanteri is attempting to change her sworn testimony after the fact, and that she has mischaracterized the testimony in her brief.  [Filing No. 242 at 36.] Defendants also argue that the Court should accept as an undisputed fact that Ms. Lanteri knew

---

[7] The portion of Ms. Lanteri's deposition testimony on which Defendants rely reads:

> Q:  Do you know if it was a Chapter 7 bankruptcy?
> A.  It was a Chapter 7 bankruptcy.
> Q:  Do you know what a Chapter 7 bankruptcy is?
> A:  Fully discharging the debts.
> Q:  Okay. What's that mean?
> A:  That I no longer have to repay specific debts other than student loans, and we got to keep the car and the house we were renting.

[Filing No. 237-4 at 21-22.]

the debt was discharged because Defendants included this assertion in its Statement of Undisputed Material Facts, and Ms. Lanteri did not contradict this in her Statement of Material Facts Not in Dispute.  [Filing No. 242 at 35-36 (citing Local Rule 56-1).]

Ms. Lanteri responds by reiterating that Defendants have mischaracterized her deposition testimony and have ignored the fact that Ms. Lanteri's discharge was not granted until after the FDCPA-violating communications were made.  [Filing No. 19.]  Ms. Lanteri argues that CPA does not dispute that it called Ms. Lanteri: (1) after she notified CPA that she had filed for bankruptcy; (2) despite CPA knowing that Ms. Lanteri was represented by counsel; and, (3) despite Ms. Lanteri telling CPA to stop contacting her.  [Filing No. 234 at 19.]

The "test for determining whether a debt collector violated § 1692e is objective, turning not on the question of what the debt collector knew but on whether the debt collector's communication would deceive or mislead an unsophisticated, but reasonable, consumer." *Turner v. J.V.D.B. & Assocs., Inc.*, 330 F.3d 991, 996 (7th Cir. 2003).  "While the unsophisticated debtor is considered 'uninformed, naïve, or trusting,' [s]he is nonetheless deemed to possess 'rudimentary knowledge about the financial world and is capable of making basic logical deductions and inferences.'" *Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Fields v. Wilber Law Firm, P.C.*, 383 F.3d 562, 564–66 (7th Cir.2004) (internal quotations omitted).  The "plaintiff bears the burden of proving that even a false statement would mislead or deceive the unsophisticated consumer." *Ruth*, 577 F.3d at 800.

There are three categories of cases alleging the use of misleading or deceptive statements in violation of the FDCPA. *Id*. at 800.  "In the first category are cases involving statements that plainly, on their face, are not misleading or deceptive." *Id*.  In those cases, a court may grant summary judgment in favor of the defendant based on the conclusion that the statement complied

with the law.  *Id.*  The second category of cases involves statements that are not plainly misleading or deceptive on their face but might possibly mislead or deceive the unsophisticated consumer.  *Id.* In those cases, "plaintiffs may prevail only by producing extrinsic evidence, such as consumer surveys, to prove that unsophisticated consumers do in fact find the challenged statements misleading or deceptive."  *Id.*  The third category of cases involves communications that are "plainly deceptive" or "clearly misleading on their face."  *Id.* at 801.  In those cases, plaintiffs are not required to produce extrinsic evidence showing that the communication was misleading, and a court may "grant summary judgment for the plaintiffs without requiring them to prove what is already clear."  *Id.*; *see also Durkin*, 406 F.3d at 415 ("In some situations, when an FDCPA violation is so 'clearly' evident on the face of a collection letter, a court may award summary judgment to the FDCPA plaintiff.").

As noted by the Seventh Circuit Court of Appeals, "[w]hether a debt is legally enforceable is a central fact about the character and legal status of that debt.  A misrepresentation about that fact thus violates the FDCPA."  *McMahon v. LVNV Funding, LLC*, 744 F.3d 1010, 1020 (7th Cir. 2014).  In *Randolph v. IMBS, Inc*., 368 F.3d 726, 728 (7th Cir. 2004), the Seventh Circuit held that a consumer who received a collection letter after filing for bankruptcy could file an FDCPA suit against the debt collector under § 1692e(2)(A) because "a demand for immediate payment while a debtor is in bankruptcy (or after the debt's discharge) is 'false' in the sense that it asserts that money is due, although, because of the automatic stay (11 U.S.C. § 362) or the discharge injunction (11 U.S.C. § 524), it is not."  Such a false statement is "presumptively wrongful" under the FDCPA, regardless of whether the debt collector was aware that the statement was false, but the debt collector may assert the bona fide error defense to avoid liability.  *Id.*

As an initial matter, Defendants argue that the communications to Ms. Lanteri were not misleading because she knew her debt was discharged in bankruptcy, but the testimony upon which Defendants rely does not support that conclusion.  [*See* Filing No. 237-4 at 21-22.]  Ms. Lanteri simply testified that she knew that a Chapter 7 bankruptcy is "[f]ully discharging the debts. . . . other than student loans."  [Filing No. 237-4 at 21-22.]  The cited testimony does not demonstrate that Ms. Lanteri knew when she received the communications, prior to the discharge, that the debt CPA was trying to collect could not be collected while her bankruptcy was pending.  *See Lox*, 689 F.3d at 825-26 (rejecting the argument that the plaintiff's deposition testimony established that he was not confused because, in relevant part, the testimony did not indicate what the plaintiff believed at the time when he received the communication in question and concluding that plaintiff's subjective belief was irrelevant to the unsophisticated consumer test, which is an objective inquiry).  Therefore, Defendants cannot rely on this testimony to support their argument that the communications were not misleading.

That testimony aside, Defendants make no argument that the communications attempting to collect a debt during Ms. Lanteri's bankruptcy were not false or would not mislead a reasonable, unsophisticated consumer.  Defendants do not dispute that CPA received notice of Ms. Lanteri's bankruptcy in early May of 2013, that the filing of the bankruptcy case triggered an automatic stay that prevented collection of the debt, s*ee, e.g.*, *In re Radcliffe*, 563 F.3d 627, 630 (7th Cir. 2009) ("Immediately upon the filing of a bankruptcy petition, § 362 of the bankruptcy code provides for an automatic stay of efforts outside the bankruptcy proceeding to collect debts from the bankrupt debtor."), or that the subsequent communications constituted attempts to collect the debt.   The demands for payment were "false" statements because the debt could not be collected during the bankruptcy proceeding.  *See Randolph*, 368 F.3d at 728*.*  The Court concludes that such statements

were plainly misleading and deceptive on their face and would cause a reasonable, unsophisticated consumer to be misled into believing that money was due when it was not.  Having already determined that Defendants are not entitled to the bona fide error defense, judgment in Ms. Lanteri's favor is warranted based on these plainly false and misleading communications.  *See Ruth*, 577 F.3d at 801; *Durkin*, 406 F.3d at 415; *Randolph*, 368 F.3d at 730 ("§ 1692e(2)(A) creates a strict-liability rule. Debt collectors may not make false claims, period.").  Accordingly, Ms. Lanteri's Cross-Motion for Summary Judgment is **GRANTED** as to her claims under §§ 1692e and 1692e(2) of the FDCPA.  Defendants' Motion for Summary Judgment is **DENIED** as to these claims.

## IV.
### CONCLUSION

Based on the foregoing, the Court now makes the following rulings:

1. Defendants' Motion for Summary Judgment, [234], is **REOPENED, GRANTED IN  PART**  and **DENIED IN PART** as follows:

   a. The Motion is **GRANTED** as to the Class's TCPA claim;

   b. The Motion is **DENIED** to the extent that Defendants sought a judgment that Etan cannot be held liable for CPA's actions;

   c. The Motion is **DENIED** to the extent that Defendants sought a judgment that they are entitled to assert the bona fide error defense;

   d. The Motion is **DENIED** as to Ms. Lanteri's FDCPA claims under 15 U.S.C. §§ 1692c(a)(2), 1692c(c), 1692e, and 1692e(2).

2. Ms. Lanteri's and the Class's Cross-Motion for Summary Judgment [231] is **REOPENED,  GRANTED IN PART** and **DENIED IN PART** as follows:

   a. The Class's Motion is **DENIED** as to the Class's TCPA claim;

b. Ms. Lanteri's Motion is **GRANTED** to the extent that she sought a judgment that Etan can be held liable for CPA's actions;

c. Ms. Lanteri's Motion is **GRANTED** to the extent that she sought a judgment that Defendants are not entitled to the bona fide error defense;

d. Ms. Lanteri's Motion is **GRANTED** on the issue of liability only as to her FDCPA claims under 15 U.S.C. §§ 1692c(a)(2), 1692c(c), 1692e, and 1692e(2).

**The two issues that remain unresolved are: (1) the amount of damages that should be awarded on Ms. Lanteri's successful FDCPA claims; and (2) liability and damages on Ms. Lanteri's individual TCPA claim, limited to her claim alleging unlawful prerecorded voice messages, which was not addressed in either summary judgment motion**.  These issues shall proceed to trial, which shall be scheduled by separate order.  The Court requests that the Magistrate Judge confer with the parties concerning an agreed upon resolution of this case short of trial.

Date: 6/15/2020

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**

36